ORIGINAL

Approved: _____
SARAH LAI
Assistant United States Attorney

Before:    THE HONORABLE
           United States Magistrate Judge
           Southern District of New York

## 18 MAG 3069

- - - - - - - - - - - - - - - - - - - X
                                       :    **SEALED COMPLAINT**
UNITED STATES OF AMERICA               :
                                       :    Violations of 18
        - v. -                         :    U.S.C. §§ 1343 and 2
                                       :
ELIZABETH ANN PIERCE,                  :    COUNTY OF OFFENSE:
                                       :    NEW YORK
                    Defendant.         :
- - - - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

    SEAN J. BARTNIK, being duly sworn, deposes and says that he
is a Special Agent with the Federal Bureau of Investigation
("FBI") and charges as follows:

### COUNT ONE
(Wire Fraud)

    1.   From at least in or about May 2015, up to and
including at least in or about July 2017, in the Southern
District of New York and elsewhere, ELIZABETH ANN PIERCE, the
defendant, willfully and knowingly, having devised and intending
to devise a scheme and artifice to defraud, and for obtaining
money and property by means of false and fraudulent pretenses,
representations, and promises, did transmit and cause to be
transmitted by means of wire, radio, and television
communication in interstate and foreign commerce, writings,
signs, signals, pictures, and sounds, for the purpose of
executing such scheme and artifice, to wit, in order to
fraudulently induce investors to invest over $250 million in the
Alaska-based high-speed fiber optic company of which she was the
chief executive officer, PIERCE forged counterparties'
signatures on approximately five contracts for the sale of
broadband capacity and related documents, which she sent or

caused to be sent by fax or over the Internet from Anchorage, Alaska, to Manhattan, New York.

(Title 18, United States Code, Sections 1343 and 2.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

2.    I am a Special Agent with the FBI, assigned to a financial crimes squad.  I have received training and have participated in investigations of financial crimes.  I have been involved personally in the investigation of this matter.  I am familiar with the facts and circumstances set forth below from my personal participation in the investigation, including my examination of reports and records, interviews I have conducted, and conversations with other law enforcement officers and other individuals.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, unless noted otherwise.

## THE RELEVANT ENTITIES AND THE DEFENDANT

3.    From reviewing documents and other information provided by an investment company based in Manhattan, New York ("Victim Firm-1") and publicly available information, I am aware that at all times relevant to this Complaint:

a.    ELIZABETH ANN PIERCE, the defendant, was the chief executive officer ("CEO") of a telecommunications company located in Anchorage, Alaska (the "Fiber Optic Company"),[1] that built, operates and markets a 1,400-mile high-speed fiber optic cable system.  The system consists of three segments: an underwater segment that spanned the Alaska Arctic (the "Subsea System"); a land-based segment that runs north to south along the Dalton Highway (the "Terrestrial System"); and a land-based

---

[1] The Fiber Optic Company comprises several inter-connected companies.  For purposes of this Complaint, each company and the companies collectively are referred to as the "Fiber Optic Company."

network of pre-existing fibers (the "In-Field System") connecting the Subsea and Terrestrial Systems that the Fiber Optic Company wholly or jointly owned or controlled with another telecommunications company.  In this affidavit, I will refer to the three segments together as the "Fiber Optic System."  The Fiber Optic System connects to the lower 48 States through other existing networks.

b.    Victim Firm-1 is a certain private equity firm headquartered in Manhattan, New York, that invests in, among other sectors, the communications industry.  Victim Firm-2 is a subsidiary of a certain French corporate and investment banking and asset management firm.  I will refer to Victim Firm-1 and Victim Firm-2 together as the "Victim Firms."

c.    TelCo-1, TelCo-2, TelCo-3, TelCo-4, and TelCo-5 (collectively, the "TelCos") are other telecommunications companies based in Alaska that resell broadband services to other telecommunications companies and/or end users, such as businesses and households.

## OVERVIEW OF THE FRAUD SCHEME

4.    As discussed in further detail below, between in or about May 2015 and in or about July 2017, ELIZABETH ANN PIERCE, the defendant, perpetrated a multi-million-dollar fraud scheme against the Victim Firms.  Specifically, in order to induce the Victim Firms to invest over $250 million in the construction, operation and marketing of the Fiber Optic System, PIERCE presented contracts (the "Fake Revenue Agreements") with the Tel-Cos that purportedly contained binding commitments by the Tel-Cos to purchase specific wholesale quantities of bandwidth – measured in gigabits per second ("Gbps") – from the Fiber Optic Company at specified prices.  The cumulative value of the Fake Revenue Agreements was more than $24 million during the first year of the Subsea System's operation, approximately $10 million during the first year of the Terrestrial System's operation, and approximately $1 billion over the life of the Agreements.  In truth and in fact, the Fake Revenue Agreements were completely worthless because PIERCE had forged the counterparties' signatures.

## The Fiber Optic System

5.    From reviewing documents, email communications and other information provided by the Fiber Optic Company and Victim Firm-1, I learned the following:

a.    Beginning at least in or about 2014, ELIZABETH ANN PIERCE, the defendant, and others conceived of a plan to build an international, high-speed fiber optic network.  As planned, the U.S. portion of the network would offer a lower cost alternative to expensive satellite-based telecommunications services to northern Alaska and would connect northern Alaska to the lower 48 States via existing fiber optic networks operated by other telecommunications companies.  PIERCE and her then-business partners planned to sell broadband capacity from the Fiber Optic System exclusively to governmental entities and other telecomm companies that, in turn, served retail end users such as businesses and households.

b.    Beginning at least in or about early 2014, PIERCE and others began soliciting substantial investment capital from Victim Firm-1 for the construction of the Fiber Optic System. By at least in or about April 2014, PIERCE had informed Victim Firm-1 that the Fiber Optic Company had executed long-term contracts to sell bandwidth on the Fiber Optic System to at least two telecommunications companies, including TelCo-1, once the System became operational.  Those contracts were expected to generate tens of millions of dollars in revenue during the System's first year in service.

c.    The Fiber Optic Company's revenue agreements contained certain standard provisions.  Those provisions included, among others: the customer's initial minimum capacity commitment, if any; the customer's incremental capacity commitment, if any; pricing; originating and ending points of service, and stops in between, if applicable; permitted and/or prohibited resale customers, if any; and reference to an order form.  Some contracts were "take-or-pay" contracts.  Under a "take-or-pay" contract, a customer agreed to buy a predetermined amount of bandwidth regardless of its ability to resell that bandwidth to other telecommunications companies or to retail customers.  Thus, take-or-pay contracts provided guaranteed streams of future revenue to the Fiber Optic Company while shifting the risk of unsold excess capacity to the customer.

4

Other agreements contained no commitment by the customer to buy any minimum amount of broadband capacity; rather, the customer's purchase obligation was triggered if, and only if, the customer subsequently submitted an order form to the Fiber Optic Company, and the form was signed by the Fiber Optic Company and the customer.  Because the corresponding order form contained billing, contact, pricing and routing information, even take-or-pay contracts had corresponding order forms.  PIERCE was the only person who signed revenue agreements and order forms on behalf of the Fiber Optic Company.

        d.    In or about early 2015, PIERCE informed Victim Firm-1 that the TelCo-1 contract was in jeopardy.  To remedy the resulting revenue shortfall, PIERCE stated that she was negotiating with TelCo-1's expected customers for revenue contracts that would cumulatively yield comparable volume and value.  Meanwhile, the Fiber Optic Company was under pressure to move forward with construction, especially of the Subsea System, before the onset of the Arctic winter.

### The Fake Revenue Agreements

        6.    To ensure the continued influx of investment capital, the Fiber Optic Company needed to show a guaranteed revenue stream.  To this end, ELIZABETH ANN PIERCE, the defendant, negotiated and attempted to negotiate take-or-pay contracts for the sale of capacity to other telecommunications companies on a wholesale basis.  As described below, when she failed to reach agreement with potential customers, she manufactured fraudulent contracts, which she presented to Victim Firm-1 as legitimate.

### The Fake TelCo-2 Agreements

        7.    From reviewing documents, email communications and other information provided by the Fiber Optic Company, Victim Firm-1 and TelCo-2, I am aware of the following:

        a.    Beginning at least in or about early 2015, ELIZABETH ANN PIERCE, the defendant, attempted to negotiate contracts to sell capacity on the Terrestrial and Subsea Systems to TelCo-2 on a "take-or-pay" basis.  According to TelCo-2's then-CEO, TelCo-2 had specifically and consistently informed

PIERCE that TelCo-2 could not enter into any take-or-pay capacity agreement.

       b.   Nevertheless, in or about May 2015, PIERCE provided a copy of a purported take-or-pay contract with TelCo-2 for Terrestrial capacity (the "Fake TelCo-2 Terrestrial Agreement") from Alaska to Victim Firm-1.  That contract was dated May 11, 2015, and signed in the name of TelCo-2's then-CEO ("TelCo-2's Former CEO").  Under that contract, TelCo-2 supposedly agreed to buy more than $4 million worth of broadband capacity during the first year of the Terrestrial System's operation, and a total of more than $20 million over the life of the Agreement.

       c.   On or about June 11, 2015, PIERCE emailed to Victim Firm-1 her revenue projections for a take-or-pay contract with TelCo-2 for Subsea capacity (the "Fake TelCo-2 Subsea Agreement").  PIERCE's worksheet showed revenue of more than $16 million as of the date the Subsea System was to become operational, and steadily ramping up annually over a 20-year period, generating hundreds of millions of dollars in guaranteed take-or-pay revenue over the life of the contract.

       d.   On or about June 14, 2015, PIERCE sent an email to Victim Firm-1 indicating that TelCo-2's Former CEO "was nervous but very committed" and that she would "help them to ensure success."  In the same email, PIERCE promised to upload a copy of the contract to a Google Drive account that she controlled (the "Google Drive Account").  The contract that PIERCE uploaded, or caused to be uploaded, to the Google Drive Account was the Fake TelCo-2 Subsea Agreement, which was a 20-year take-or-pay contract, signed in the name of TelCo-2's Former CEO and dated June 13, 2015.  TelCo-2's purchase obligation under that Agreement was substantially the same as PIERCE had projected in her June 11, 2015 email, discussed above.  Together, the two Fake TelCo-2 Agreements obligated TelCo-2 to pay the Fiber Optic Company hundreds of millions of dollars on a take-or-pay basis over twenty years.

    8.   In truth and in fact, TelCo-2's Former CEO, with whom I have spoken, had not signed either of the Fake TelCo-2 Agreements.  His denial is corroborated by contemporaneous emails among TelCo-2 personnel and between TelCo-2 personnel and ELIZABETH ANN PIERCE, the defendant.  Those emails show that

TelCo-2 and the Fiber Optic Company had not agreed on any
Terrestrial contract as of May 11, 2015, or any Subsea contract
as of June 13, 2015.  For example:

      a.   On or about November 4, 2015, months after the
Fake TelCo-2 Agreements were supposedly signed, a TelCo-2
officer (the "TelCo-2 Officer") sent an email to TelCo-2's new
CEO, who took over after the retirement of the previous CEO,
which made clear that negotiations with the Fiber Optic Company
for Terrestrial and Subsea contracts were still ongoing.  In
that email, the TelCo-2 Officer wrote, in substance and in part:

> She [PIERCE] wants us to work directly
> with [a certain employee at the Fiber
> Optic Company (the "Fiber Optic Company
> Employee")] to finalize the master
> contract for selling terrestrial
> contracts . . . .
>
> \*   \*   \*
>
> [The Subsea contract] has more
> breathing room as the project still has
> more [construction] work.  I will work
> with [the Fiber Optic Company Employee]
> . . . on the master contract.

      b.   On or about February 18, 2016, TelCo-2's new CEO
sent an email to PIERCE which stated, in substance and in part:

> I am not sure if there is a common
> ground that we can work towards.  The
> contracts shift significant risk from
> [the Fiber Optic Company] to TelCo-2
> regarding the market.  I cannot commit
> [TelCo-2] to the purchase of capacity
> without absolute assurances that the
> customers and revenue are there to pay
> for the capacity purchases.  So, I
> would need an absolute right that I can
> control to exit the resale agreements
> without penalty if the customers are
> not there or if the price I am paying

> [the Fiber Optic Company] is not
> competitive. . . .

TelCo-2's new CEO continued:

> If you are trying to get use [sic] the
> agreements to obtain financing I do not
> expect those conditions will allow you
> to achieve your goals since the banks
> would not look at that as enough
> assurance you have a committed revenue
> stream going forward.

   c.   On or about June 3, 2016, TelCo-2's new CEO
reiterated his message in another email to PIERCE, which stated,
in substance and in part:

> Elizabeth, I took the opportunity to
> skim through the reseller agreement and
> note that it appears to be
> substantially the same document as what
> we have seen in the past.  I cannot
> commit [TelCo-2] to any resale
> agreement that does not have an
> exclusive right on behalf of [TelCo-2]
> to terminate the resale agreement if
> the demand is not there.

   9.   The negotiations between the Fiber Optic Company and
TelCo-2 ended unsuccessfully, but ELIZABETH ANN PIERCE, the
defendant, never disclosed that fact to Victim Firm-1.

### The Fake TelCo-3 Terrestrial Agreement

   10.   I have also reviewed documents and email
correspondence produced by TelCo-3, the Fiber Optic Company and
Victim Firm-1 pursuant to grand jury subpoenas and spoken with
another agent who spoke with a former TelCo-3 executive ("TelCo-
3's Former CEO").   From those sources, I know that:

   a.   Beginning at least in or about 2015, ELIZABETH
ANN PIERCE, the defendant, attempted to negotiate a contract to
sell Terrestrial capacity to TelCo-3.   On or about May 9, 2015,

PIERCE sent an email to Victim Firm-1 attaching a draft contract with TelCo-3, with the message "[TelCo-3] will purchase . . . [a certain amount of capacity] directly from [the Fiber Optic Company]." That email was followed on or about May 14, 2015, by a copy of a Terrestrial contract with TelCo-3, signed in the name of TelCo-3'S Former CEO (the "Fake TelCo-3 Terrestrial Agreement"), which was faxed from Alaska to Victim Firm-1 in New York, New York. Under that Agreement and a corresponding order form, TelCo-3 supposedly committed to buying over $2 million worth of bandwidth during the first year of the Terrestrial System's operation and $10 million of bandwidth over a five-year period. However, TelCo-3's Former CEO has informed me that he had not signed the Fake TelCo-3 Terrestrial Agreement or the corresponding order form.

11.   Email correspondence between ELIZABETH ANN PIERCE, the defendant, and TelCo-3 reveal that PIERCE knew that the Fake TelCo-3 Terrestrial Agreement was fraudulent. Below are some of those emails:

a.   On or about May 9, 2015, the very day that PIERCE represented to Victim Firm-1 that TelCo-3 would purchase 1 Gbps on the Terrestrial System, she sent a draft Terrestrial contract to TelCo-3, suggesting that the parties had not yet agreed on the terms of a contract.

b.   On or about May 13, 2015, PIERCE responded to certain questions about the Terrestrial CSA that TelCo-3 had raised. That same day, an executive of TelCo-3 sent an email to PIERCE proposing certain "MFN [most favored nation] language" with respect to pricing, demonstrating that the parties still had not concluded their negotiations.

c.   On or about May 15, 2015, the day after the date of the Fake TelCo-3 Terrestrial Agreement, PIERCE emailed TelCo-3 a revised draft of a proposed Terrestrial contract accompanied by the message: "I'm still working on pricing commitment language."

12.   It was not until June 2017 that the Fiber Optic Company and TelCo-3 finally executed a genuine Terrestrial contract. The June 2017 contract differed from the May 9, 2015 draft in duration, pricing and geographic coverage.

### The Fake TelCo-4 Agreement

13.   From documents, email communications and other information provided by TelCo-4, the Fiber Optic Company and Victim Firm-1 pursuant to grand jury subpoenas, I learned that starting in or about early 2016, ELIZABETH ANN PIERCE, the defendant, negotiated to sell Subsea and Terrestrial capacity to TelCo-4.  On or about May 29, 2016, PIERCE informed Victim Firm-1 by email that the CSA with TelCo-4 and one other telecommunications company had been uploaded to the Google Drive Account.  The contract with TelCo-4, signed in the name of TelCo-4's President, was dated May 27, 2016 (the "Fake TelCo-4 Agreement").  Under that Agreement, TelCo-4 purportedly committed to an aggregate purchase of a fixed volume of minimum total capacity distributed across the Subsea and/or Terrestrial System.  That contract would have generated a minimum of over $2 million during the first year of the System's operation.  PIERCE represented to Victim Firm-1 that TelCo-4's purchase agreement was a take-or-pay commitment.

14.   In truth and in fact, TelCo-4's President had not signed the Fake TelCo-4 Agreement.  Email correspondence between ELIZABETH ANN PIERCE, the defendant, and TelCo-4 officers not only shows that negotiations had not concluded as of May 27, 2016, the date of the Fake TelCo-4 Agreement, but also that TelCo-4 specifically refused to commit to a predetermined amount of bandwidth.  To the contrary, TelCo-4 insisted on a provision under which TelCo-4 would only have to pay for capacity that it requested pursuant to a separate order form, meaning the agreement was not a take-or-pay contract.  The following are examples of pertinent emails in which this subject was discussed:

a.   In an email dated June 1, 2016, or five days after the date of the Fake TelCo-4 Agreement, a TelCo-4 Officer ("TelCo-4 Officer-1") wrote to a Fiber Optic Company officer ("Fiber Optic Company Officer-1") as follows:

We would like to add the following:

"Customer is not obligated to purchase Capacity except as provided in a signed Order and Service Delivery Form" . . .

> The intent behind this addition is to
> have language that clearly defines how
> we buy Capacity."

b.    That same day, Fiber Optic Company Officer-1 forwarded TelCo-4 Officer-1's email to PIERCE, with the following suggestion:

> Since the intent is to clarify how
> specifically they [TelCo-4] purchase
> capacity and how we will charge them
> for the capacity we might consider
> adding some clarifying language . . .
>
> The [Fiber Optic Company] shall invoice
> Monthly Recurring Charges ("MRC") for
> all Capacity ordered on an Order and
> Service Delivery Form (Schedule 6)
> including initial capacity to the
> Customer. . . .

(Underlining in original).

c.    Later on the same day, Fiber Optic Company Officer-1 emailed a revised contract to the TelCo-4 CEO, pointing to "changes that hopefully address the question that was posed by [TelCo-4 Officer-1] today regarding buying capacity."

d.    On June 2, 2016, the TelCo-4 President sent a final draft of the contract, backdated to May 27, 2016, with the comment, "We have accepted all of your changes to the document and have no further changes to offer."

15.    The genuine final, executed version of the TelCo-4 Agreement contained provisions that comported with Fiber Optic Company Officer-1's recommendations, but that are not in the Fake TelCo-4 Capacity Agreement.  Specifically:

a.    Section 5.2 read, in relevant part, "Initial Capacity will be submitted on the Order and Service Delivery form[.]"

b.    Section 6.3 read, in relevant part, "The Provider shall invoice Monthly Recurring Charges ("MRC") for all Capacity ordered on an Order and Service Delivery Form . . . including initial capacity[.]"

### The Fake TelCo-5 Subsea Agreement

16.   I have also reviewed documents and email correspondence provided by TelCo-5, the Fiber Optic Company and Victim Firm-1 in response to grand jury subpoenas, and spoken with TelCo-5 officers.  From those records and interviews, I know the following:

a.    From at least in or about June 2016 to in or about December 2016, ELIZABETH ANN PIERCE, the defendant, negotiated to sell capacity on the Subsea System to TelCo-5. Those efforts resulted in an agreement (the "Genuine TelCo-5 Subsea Agreement") which was executed in December 2016, but backdated to September 17, 2016, at PIERCE's request.  A TelCo-5 officer ("TelCo-5 Officer-1") signed on behalf of TelCo-5. Under the Genuine TelCo-5 Subsea Agreement, TelCo-5 had the right to resell bandwidth only to specified telecommunications companies.

b.    On or about September 20, 2016, PIERCE emailed a copy of a Subsea contract with TelCo-5 (the "Fake TelCo-5 Subsea Agreement") that was materially different from the Genuine TelCo-5 Subsea Agreement, to Victim Firm-1.  The Fake TelCo-5 Subsea Agreement was dated September 19, 2016, and was also signed in the name of TelCo-5 Officer-1.  However, TelCo-5 Officer-1 has informed me that he did not sign the Fake TelCo-5 Subsea Agreement.  The fake version was more favorable to the Fiber Optic Company because TelCo-5 was permitted to resell bandwidth to fewer customers under the fake version than under the genuine agreement, leaving more of the potential market to the Fiber Optic Company.

### The Fake TelCo-5 Terrestrial and Interim Agreements

17.   Under the Revenue Agreements, customers' obligation to pay for contracted capacity began on or about the in-service date of the System at issue.  The approach of the Terrestrial

System's anticipated operational date of May 2017 meant that the fake Terrestrial agreements would be exposed.  That was because the Fiber Optic Company would be billing customers for capacity they had not agreed to purchase, under contracts they had not signed.  One such customer was TelCo-2.  To delay discovery of the Fake TelCo-2 Terrestrial Agreement, ELIZABETH ANN PIERCE, the defendant, falsely informed Victim Firm-1, in sum and substance, that TelCo-2 may not meet their contractual obligations, and that she was attempting to replace the expected revenue from TelCo-2 with other revenue agreements.  As explained below, PIERCE fraudulently used TelCo-5 as a partial replacement.

18.  I learned as follows from my review of records and email correspondence provided by TelCo-5, the Fiber Optic Company and Victim Firm-1:

a.  In or about May 2015, the Fiber Optic Company entered into a genuine five-year agreement to sell capacity on the Terrestrial System to TelCo-5 (the "Genuine TelCo-5 Terrestrial Agreement").  Under that Agreement and the corresponding order form, TelCo-5 agreed to purchase a certain quantity of Terrestrial capacity starting on the date that the Terrestrial System went into service and an additional, equivalent quantity beginning on the one-year anniversary of the System's in-service date.

b.  Two years later, in or about May 2017, ELIZABETH ANN PIERCE, the defendant, provided Victim Firm-1 a copy of a second agreement to sell Terrestrial capacity to TelCo-5 over ten years (the "Fake TelCo-5 Interim Agreement").  Under that Agreement, which was signed in the name of another TelCo-5 Officer ("TelCo-5 Officer-2"), TelCo-5 purportedly contracted, among other things, to buy a third equivalent quantity starting in or about May 2017.  That commitment, if legitimate, would have generated nearly $2 million in additional revenue to the Fiber Optic Company in the first year alone.  Thus, the Fake TelCo-5 Interim Agreement created the impression that PIERCE had successfully replaced a portion of the lost revenue from TelCo-2.

c.  In truth and in fact, TelCo-5 had not agreed to purchase a third quantity of capacity pursuant to the Fake Interim Agreement, and TelCo-5 Officer-2 had not signed that

Agreement.  TelCo-5 did enter into a contract to buy Terrestrial
capacity starting in or about May 2017 (the "Genuine TelCo-5
Interim Agreement").  However, in order to secure that deal, the
Fiber Optic Company had agreed that TelCo-5 would be relieved of
its obligation under the Genuine Terrestrial Agreement to
purchase an equivalent amount of capacity starting in or about
December 2017.  The net effect of the Genuine TelCo-5
Terrestrial Agreement and Genuine TelCo-5 Interim Agreement was
that TelCo-5's capacity purchase during the first few months of
operation was double its commitment under the Genuine TelCo-5
Terrestrial Agreement, but unchanged during years two to five.

### PIERCE Forged the Fake Revenue Agreements

19.  I believe that ELIZABETH ANN PIERCE, the defendant,
was the person who forged all of the fake counterparty
signatures on the Fake Revenue Agreements described above for
the following reasons, among others:

a.  In an email to TelCo-3 dated June 30, 2017,
PIERCE herself stated, "I am the only person at [the Fiber Optic
Company] to authorize or otherwise accommodate customer requests
or alleged contract issues." (Emphasis in original).  Thus, it
is inconceivable that other [Fiber Optic Company] personnel
could have forged the contracts without her knowledge and
consent.

b.  PIERCE's assertion was corroborated by voluminous
email correspondence that showed that PIERCE was the only Fiber
Optic Company executive who ever negotiated substantive contract
terms and conditions with the Fiber Optic Company's customers.

c.  PIERCE signed all of the Fake Revenue Agreements
on behalf of the Fiber Optic Company.  If she had not forged the
counterparty signatures, she would be expected to question the
legitimacy of those signatures, knowing that the Fiber Optic
Company and the counterparty at issue were still negotiating, as
discussed above.  Instead, she falsely represented to Victim
Firm-1 that the Fake Revenue Agreements were genuine.

d.  PIERCE personally sent, or caused to be sent, the
Fake Revenue Agreements to Victim Firm-1 and represented that
they were authentic.

        e.    At least some of the Fake Revenue Agreements were
located on, and deleted from, the Google Drive Account which
PIERCE controlled.

## The Fraudulently Induced Investments

        20.    Documents produced by Victim Firm-1, which I have
reviewed, showed that Victim Firm-1 has invested over $200
million in the Fiber Optic System between in or about May 2015
and in or about December 2017, making it the Fiber Optic
Company's largest shareholder by far.    From speaking with a
representative of Victim Firm-1 ("Victim Firm-1's
Representative"), I also know that Victim Firm-1 would not have
invested any of that amount in the Fiber Optic Company had it
known that ELIZABETH ANN PIERCE, the defendant, was forging
counterparty signatures on the Fake Revenue Agreements.    Nor
would Victim Firm-1 have invested in the Fiber Optic Company
without the existence of take-or-pay revenue contracts, which
increased the purported guaranteed value of the Fiber Optic
System.

        21.    In addition to investing its own funds in the Fiber
Optic Company, Victim Firm-1 also spearheaded the Fiber Optic
Company's efforts to obtain a $50 million loan from Victim Firm-
2 to build the Fiber Optic System.    Among other things, Victim
Firm-1, with the active participation of ELIZABETH ANN PIERCE,
the defendant, made written and verbal presentations to Victim
Firm-2 that contained information from the Fake Revenue
Agreements.    Victim Firm-1's Representative has informed me that
Victim Firm-1 would not have assisted with this loan had it
known PIERCE was forging counterparty signatures on the Fake
Revenue Agreements.

## The Scheme Unraveled, and PIERCE Deleted Certain Fake Revenue Agreements and Abruptly Resigned from the Fiber Optic Company

        22.    In or about April 2017, a Fiber Optic Company staff
member sent invoices to TelCo-4 in anticipation of the
Terrestrial System becoming operational.    TelCo-4 disputed the
invoices, as it had not yet ordered any capacity.    In support of
its position, TelCo-4 produced a copy of the Genuine TelCo-4
Agreement and the email correspondence described in paragraph 14
above to the Fiber Optic Company and Victim Firm-1.    Victim

Firm-1, as majority owner of the Fiber Optic Company, began an internal investigation and discovered other potentially fraudulent revenue agreements.  As part of that investigation, on or about July 16, 2017, a Victim Firm-1 member accessed and took screenshots of the Google Drive Account.   Those screenshots, which I have seen, depicted an activity log which read, "Elizabeth Pierce moved 78 items to the trash" two days earlier.  The deleted files included the following, which were recovered from Google pursuant to a search warrant:

        a.    The Fake TelCo-2 Terrestrial Agreement with a signature date of May 11, 2015;

        b.    The fake TelCo-3 order form corresponding to the Fake TelCo-3 Terrestrial Agreement;

        c.    The Fake TelCo-4 Agreement, dated May 27, 2016;

        d.    An invoice for capacity on the Terrestrial System for the period from "April 1 to April 30, 2017," presumably under the Fake TelCo-2 Terrestrial Agreement; and

        e.    The Fake TelCo-2 Subsea Agreement.

    23.    Metadata for the files described in paragraph 22(a)-(e) above showed that (i) each file had been moved to the Google Drive Account's trash bin, although not the date that occurred; and (ii) the file "owner" was "Elizabeth.pierce@quintillionnetworks.com," and no one else, which I understand means only ELIZABETH ANN PIERCE, the defendant, could have deleted the files.

    24.    On or about July 25, 2017, counsel for the Fiber Optic Company and Victim Firm-1 interviewed ELIZABETH ANN PIERCE, the defendant, who was represented by her personal lawyer.  I have read a summary of that interview and learned that:

        a.    PIERCE stated, in substance and in part, the following:

        i.    TelCo-2 was one of the first customers to sign a revenue contract, but PIERCE was unable to recall the

circumstances of getting TelCo-2's countersignature on either the Terrestrial or Subsea Agreement. She also could not remember the name of TelCo-2's counsel who was involved in the negotiations.

   ii. PIERCE faxed a copy of the TelCo-2 Terrestrial Agreement to Victim Firm-1 after it was executed by TelCo-2.

   iii. PIERCE's last conversation with her main contact person at TelCo-2 was a few weeks earlier, but she could not remember the topic of that conversation.

  b. PIERCE terminated the interview after approximately thirty minutes, and adjourned it to the following day, July 26, 2017. However, hours before the interview was to resume, PIERCE's attorney canceled the meeting because PIERCE had purportedly taken ill. PIERCE never sat for another interview with counsel for the Fiber Optic Company and Victim Firm-1.

 WHEREFORE, deponent prays that an arrest warrant be issued for ELIZABETH ANN PIERCE, the defendant, and that she be imprisoned or bailed, as the case may be.

SEAN J. BARTNIK
Special Agent
Federal Bureau of Investigation

Sworn to before me this
___th day of April 2018

HONORABLE ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

17