UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    v.                                               S1 18 Cr. 388 (ER)

ELIZABETH ANN PIERCE,

                  Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


# THE GOVERNMENT'S MOTIONS *IN LIMINE*


                                       GEOFFREY S. BERMAN
                                       United States Attorney for the
                                       Southern District of New York
                                       Attorney for the United States of America


Sarah Lai
Vladislav Vainberg
Assistant United States Attorneys
       - Of Counsel -

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 5

BACKGROUND ................................................................................................................... 6

DISCUSSION ..................................................................................................................... 12

   I.   Evidence of Pierce's Fraud Against Victim-3 And Victim-4 Are Admissible as Direct Evidence of the Charged Scheme or, in the Alternative, Pursuant to Rule 404(b) .................... 12

     A.   Applicable Law ............................................................................................ 13

        1.   Prior Crimes or Other Acts Admissible as Direct Evidence ....................... 13

        2.   Other Acts Admissible Under Rule 404(b) ............................................... 14

     B.   Discussion .................................................................................................. 16

        1.   Evidence of the Frauds Against Victim-3 and Victim-4 is Admissible as Direct Proof of the Charged Scheme ..................................................................... 16

        2.   Evidence of the Frauds Against Victim-3 and Victim-4 Is Also Admissible Pursuant to Rule 404(b) ............................................................................................ 17

   II.   The Court Should Preclude The Defense From Offering Evidence Relating to Quintillion's Operations and Financial Condition After Pierce's Resignation ............................................... 19

     A.   Applicable Law ............................................................................................ 20

     B.   Discussion .................................................................................................. 21

   III.   The Court Should Preclude Cross-Examination That Invades Upon The Attorney-Client Privilege .......................................................................................................................... 22

     A.   Applicable Law ............................................................................................ 23

     B.   Discussion .................................................................................................. 24

   IV.   The Court Should Preclude Cross-Examination Of Witnesses On Matters Beyond The Scope Of Their Direct Examinations ........................................................................................ 26

     A.   Applicable Law ............................................................................................ 26

     B.   Discussion .................................................................................................. 26

CONCLUSION .................................................................................................................... 28

# TABLE OF AUTHORITIES

**Federal Cases**

*Baker v. Goldman Sachs & Co.*, 669 F.3d 105 (2d Cir. 2012) ...................................... 26

*Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008) ...................................... 20

*Huddleston v. United States*, 485 U.S. 681 (1988) .................................................. 14, 15

*In re Grand Jury Investigation*, 399 F.3d 527 (2d Cir. 2005) ................................ 24, 25

*Neder v. United States*, 527 U.S. 1 (1999) ............................................................... 21

*Swidler & Berlin v. United States*, 524 U.S. 399 (1998) ........................................ 24

*United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650 (2d Cir. 2016). 20

*United States v. Abakporo*, 12 Cr. 340 SAS, 2014 WL 2608857 (S.D.N.Y. June 9, 2014) .......... 21

*United States v. Adeniyi*, No. 03 Cr. 86 (LTS), 2004 WL 1077963 (S.D.N.Y. May 12, 2004) ..... 27

*United States v. Aguilar*, 59 F. App'x. 326 (10th Cir. 2003) .................................. 18

*United States v. Baez*, 349 F.3d 90 (2d Cir. 2003) ................................................. 13

*United States v. Bari*, 750 F.2d 1169 (2d Cir. 1984) ............................................. 26

*United States v. Binday*, 804 F.3d 558 (2d Cir. 2015) ........................................... 20

*United States v. Birrell*, 447 F.2d 1168 (2d Cir. 1971) .......................................... 15

*United States v. Brand*, 467 F.3d 179 (2d Cir. 2006) ............................................ 14

*United States v. Caputo*, 808 F.2d 963 (2d Cir. 1987) ........................................... 15

*United States v. Carboni*, 204 F.3d 39 (2d Cir. 2000) ........................................ 13, 16

*United States v. Cardillo*, 316 F.2d 606 (2d Cir. 1963) .......................................... 23

*United States v. Coonan*, 938 F.2d 1553 (2d Cir. 1991) ........................................ 13

*United States v. Costanzo*, 581 F.2d 28 (2d Cir. 1978) .......................................... 27

*United States v. Coven*, 662 F.2d 162 (2d Cir. 1981) ........................................ 23, 25

*United States v. Dennis*, 843 F.2d 652 (2d Cir. 1988) ........................................... 23

*United States v. Dinome*, 86 F.3d 277 (2d Cir. 1996) ............................................ 20

*United States v. Figueroa*, 618 F.2d 934 (2d Cir. 1980) ........................................ 16

*United States v. Gonzalez*, 110 F.3d 936 (2d Cir. 1997) ..................................... 13, 16

*United States v. Greenberg*, 835 F.3d 295 (2d Cir. 2016) ....................................... 20

*United States v. Inserra*, 34 F.3d 83 (2d Cir. 1994) ............................................. 13

*United States v. Koskerides*, 877 F.2d 1129 (2d Cir. 1989) .................................... 27

*United States v. LaFlam*, 369 F.3d 153 (2d Cir. 2004) .......................................... 14

*United States v. Lin*, 225 F.3d 647, 2000 U.S. App. LEXIS 23455 (2d Cir. Sept. 12, 2000) ........ 23

*United States v. Martinez-Montilla*, 82 F. App'x 53 (2d Cir. 2003) ........................... 27

*United States v. McCallum*, 584 F.3d 471 (2d Cir. 2009) ....................................... 15

*United States v. Mejia*, 655 F.3d 126 (2d Cir. 2011) ............................................ 23

*United States v. Mercado*, 573 F.3d 138 (2d Cir. 2009) ......................................... 14

*United States v. Newsom*, 438 F. App'x 16 (2d Cir. 2011) ................................... 14, 18

*United States v. Novak*, 443 F.3d 150 (2d Cir. 2006) ........................................... 20

*United States v. Pitre*, 960 F.2d 1112 (2d Cir. 1992) ........................................ 15, 16

*United States v. Quinones*, 511 F.3d 289 (2d Cir. 2007) ........................................ 13

*United States v. Roldan-Zapata*, 916 F.2d 795 (2d Cir. 1990) ................................. 16

*United States v. Rosa*, 11 F.3d 315 (2d Cir.1993) ............................................... 26

3

*United States v. Rude*, 88 F.3d 1538 (9th Cir. 1996) ................................................................. 18

*United States v. Scali*, No. 16 Cr. 466 (NSR), 2018 WL 604852 (S.D.N.Y. Jan. 29, 2018) .......... 25

*United States v. Smith*, 727 F.2d 214 (2d Cir. 1984) ................................................................. 18

*United States v. Sparkman*, 500 F.3d 678 (8th Cir. 2007) ........................................................ 18

*United States v. Vargas*, 702 F. Supp. 70 (S.D.N.Y. 1988) ........................................................ 16

*United States v. Whitten*, 610 F.3d 168 (2d Cir. 2010) ............................................................. 26

*United States v. Zackson*, 12 F.3d 1178 (2d Cir. 1993) ........................................................ 15, 16

**Statutes**

18 U.S.C. § 1343 (2012) ............................................................................................................. 20

**Rules**

Fed. R. Evid. 401 ....................................................................................................................... 21

Fed. R. Evid. 402 ....................................................................................................................... 21

Fed. R. Evid. 403 ................................................................................................................. 16, 21

Fed. R. Evid. 404 ....................................................................................................................... 14

Fed. R. Evid. 501 ....................................................................................................................... 24

Fed. R. Evid. 611 ....................................................................................................................... 26

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in support of its motions *in limine* in advance of the trial of Elizabeth Ann Pierce, the defendant (the "defendant" or "Pierce"), scheduled to begin on February 19, 2019.  As set forth below, the Government seeks the following pre-trial rulings from the Court:  (1) permitting the Government to offer other act evidence that the defendant defrauded one individual with false promises of shares in Quintillion Networks LLC (collectively, with affiliated companies, "Quintillion"),[1] the fiber optic network company which the defendant developed and operated, and defrauded another individual with false promises of shares in Alaska Fiber Holdings LLC, a company that purportedly owned shares in Quintillion; (2) precluding the defense from eliciting testimony or other evidence regarding Quintillion's operations or financial status after the defendant's abrupt resignation from the company during its internal investigation; (3) barring the defense from cross-examining a paralegal who is expected to testify regarding any communications protected by the attorney-client privilege; and (4) precluding the defense from cross-examining the prosecution's witnesses, in particular the paralegal and two Federal Bureau of Investigation agents, on matters that are outside the scope of their direct examination.  The parties have conferred preliminarily about these motions, and the Government anticipates that the defense will not object to at least the third and fourth motions barring any unexpected developments at trial.  For that reason and the ones discussed below, the Government respectfully submits that the motions should be granted.

---

[1] There are various related Quintillion companies which were reorganized during the relevant period and which currently have parent companies. One set of those companies owns and operates the land-based portion of the Fiber Optic System; the other set of Quintillion companies owns and operates the subsea portion of the Fiber Optic System. The corporate structure of Quintillion is not material to this motion. Thus, for purposes of this motion, we refer to all of the Quintillion companies, individually and collectively, as "Quintillion."

The Government further reserves the opportunity to submit a supplemental motion *in limine* requesting certain procedures for the protection of sensitive business information at trial. We plan to submit the motion together with the exhibits at issue for the Court's consideration within the next week. We have discussed the proposed procedures with the defense and do not anticipate any defense objections.

## **BACKGROUND**

Pierce is charged in a nine-count Superseding Indictment with (1) one count of wire fraud, in violation of Title 18, United States Code, Section 1343, from in or about May 2015 to in or about July 2017, in connection with a multi-million-dollar scheme to defraud investors in a high-speed fiber optic network in Alaska (the "Fiber Optic System") to be built and operated by Quintillion. The investors are identified as Victim Firm-1 and Victim Firm-2 (together, the "Victim Firms") in the underlying Complaint, docketed as 18 Mag. 3069; and (2) eight counts of aggravated identity theft, in violation of Title 18, United States Code, Section 1028A, arising from her forgery of counter-party signatures on broadband sales contracts and related order forms in furtherance of the same fraudulent scheme.

The Government anticipates that the evidence at trial will show the following, among other things: Beginning at least in or about 2012, Pierce and others began developing the idea for an international fiber optic network that would run from Japan to Europe via Alaska, and the Alaska portion would connect to the lower 48 States. The Alaska portion of the network (the "Fiber Optic System") would be built and operated by Quintillion, while the international portion was to be built and operated by another company ("Company-1"). The Fiber Optic System would consist of three segments. One is a land-based portion that runs from Deadhorse to Fairbanks (the "Terrestrial System"). The second is another shorter land-based segment that connects the oil fields in Prudhoe

Bay to Deadhorse (the "In-Field System").  The third segment (the "Subsea System") runs beneath Arctic waters off the north and northwest coast of Alaska and connects five communities in that remote region to the Terrestrial System.  Bandwidth, or capacity, from the network would be sold to other broadband wholesalers, such as other telecommunications companies.  Those customers would then resell the capacity purchased from Quintillion either to their own end users (such as businesses and households) on a retail basis, or to other telecommunications companies on a wholesale basis.  The project planning phase was funded by a small group of investors, including the defendant, a small handful of other individuals, and two Alaska-based telecommunications companies.  Their combined investment prior to 2015 was less than $10 million. This amount was expected to cover Quintillion's project planning and operating costs, including the salaries of Pierce and a small staff.

In or about May 2013, while the Fiber Optic System was still in its planning phase, Pierce solicited an investment into Quintillion from an individual ("Victim-3"), who subsequently joined Quintillion as a contractor.  To induce the investment, Pierce gave Victim-3 a Quintillion operating agreement, a financing sheet, and other projections.  Pierce and Victim-3 entered into an agreement under which Victim-3 paid Pierce $100,000 in order to receive 10,000 common shares in Quintillion at the price of $10 per share.  Pursuant to that agreement, on or about May 23, 2013, Victim-3 issued a check for $100,000, payable to Pierce, which was deposited into a Wells Fargo Bank account held in Pierce's name ("Pierce's Personal Bank Account").  In or about December 2013, Pierce and Victim-3 entered into another agreement under which Victim-3 invested another $100,000 in Quintillion in exchange for 9,901 common shares in Quintillion, at the price of $11 per share.  At Pierce's direction, on or about December 23, 2013, Victim-3 caused $100,000 to be wired from his retirement account to Pierce's Personal Bank Account.  In or about August 2014, Pierce and Victim-

3 entered into a third agreement, pursuant to which Pierce promised to transfer 500 shares of preferred Quintillion stock, with an alleged guaranteed 8% annual dividend, to Victim-3 in exchange for an additional $125,000 investment.  On or about August 15, 2014, Victim-3 issued a check for $125,000, payable to Pierce, which was deposited into Pierce's Personal Bank Account. In total, Victim-3 invested $325,000 in Quintillion.  Each time, Pierce agreed to execute all necessary paperwork for the transfer of ownership of the shares to Victim-3.  Over the years, Victim-3 periodically asked the defendant for the paperwork evincing his ownership of Quintillion shares, but never received any.  Pierce periodically provided Victim-3 with analyses indicating how Victim-3's purported shares were converted in a corporate reorganization following Victim Firm-1's investment, and projecting how those shares would increase in value when the Fiber Optic System went live.

In or about the beginning of 2014, Pierce and Company-1 began pitching the international fiber optic network to Victim Firm-1.  As of that time, Pierce had secured two revenue contracts for the sale of bandwidth expected to be generated by the Alaska portion of the network (*i.e.,* the Fiber Optic System).  Of relevance to this motion, one of those contracts, with a certain telecommunications company ("TelCo-6"), was expected to provide Quintillion with over $30 million in guaranteed revenue from the sale of capacity generated by the Subsea System during its first year of operation, and as much as $600 million over the life of the contract.  Because no revenue contracts had yet been secured for the expected capacity from the international portions of the network – *i.e.,* from Japan to Alaska, and from Alaska to Europe – Victim Firm-1 was only interested in developing the Alaska portion of the network.  As a result, Company-1's participation in the construction and operation of the network ceased, and only the Alaska portion proceeded under Quintillion's management.

In or about 2014 and early 2015, Victim Firm-1 provided limited funding totaling approximately $10 million to conduct survey work and to acquire certain resources for the Fiber Optic System, with the understanding that Victim Firm-1 would commit to funding the overall construction of the Fiber Optic System if Quintillion met certain revenue targets. Meanwhile, because the Arctic waters were accessible to ships only from in or about June to October, construction of the Subsea System had to begin in June 2015, or the project would have to be postponed to the following year.

In or about early 2015, however, it became clear that TelCo-6 would not be able to meet its contractual obligations. To ensure Victim Firm-1's financial support, Pierce informed the Firm's representatives that Quintillion would replace the foregone revenue from TelCo-6 by selling capacity directly to TelCo-6's wholesale customers. Against this backdrop, in or about May 2015, the defendant falsely represented to Victim Firm-1 that Quintillion had entered into three revenue contracts with an aggregate guaranteed minimum total contract value of nearly $340,000,000, and a projected aggregate total contract value of nearly $1 billion. The next month, the defendant falsely represented that Quintillion had secured two more revenue contracts with an aggregate guaranteed minimum contract value of approximately $128 million. Unbeknownst to Victim Firm-1, the defendant had forged the counter-parties' signatures on these contracts (the "Fake Revenue Contracts"). Relying on these Fake Revenue Contracts, in or about June 2015, Victim Firm-1 committed approximately $120 million to the construction of the Subsea System, with an upfront payment of approximately $20 million.

In or about early August 2015, Victim-4, who like Victim-3 had worked as a contractor to Quintillion, inquired with the defendant about the possibility of investing in the Fiber Optic System. In response, the defendant offered Victim-4 an investment in a company known as Alaska Fiber

Holdings, LLC ("Alaska Fiber").  According to a Letter of Agreement between Alaska Fiber, signed by Pierce as its "Manager," and Victim-4, Alaska Fiber was a shareholder in Quintillion. Under the Letter of Agreement between Alaska Fiber and Victim-4, Victim-4 was to receive 100 preferred shares in Alaska Fiber at the price of $250 per share and 125 common shares in Alaska Fiber at the price of $200 per share.  The total value of the shares was therefore $50,000.  However, although not stated in the Letter of Agreement, Pierce and Victim-4 had agreed that Victim-4 would need to invest only $40,000 to receive the $50,000's worth of shares.  The defendant informed Victim-4 that the additional $10,000's worth of shares would be a bonus for work that Victim-4 had performed as a contractor for Quintillion. Relying on the defendant's representations, on or about August 3, 2015, Victim-4 and her partner each made a check in the amount of $20,000, payable to Pierce, which were deposited into Pierce's Personal Bank Account.

Beginning in or about April 2017, in anticipation of the Terrestrial System's start of operations in late April/early May 2017, Quintillion's chief financial officer (the "CFO"), unaware of the fraudulent nature of the Fake Revenue Contracts, began sending invoices to customers, whose obligation to purchase capacity from Quintillion was to begin on the date the Terrestrial System became operational.  Those customers either rejected or ignored the invoices, which led to meetings with the customers and an internal investigation that revealed the fraudulent nature of the Fake Revenue Contracts.  By then, relying on the Fake Revenue Contracts, Victim Firm-1 had invested over $200 million in Quintillion, and had helped raise an additional $50 million in debt financing from Victim Firm-2.

As part of the internal investigation, on or about July 25, 2017, outside counsel for Quintillion and Victim Firm-1 interviewed Pierce regarding the Fake Revenue Contracts (the "July 25th Interview").  A paralegal working with Quintillion's outside counsel attended that interview.

The defendant was given an *Upjohn* warning that the interviewers did not represent her individually, and that Quintillion may choose to waive its privilege over communications between the attorney and her.[2]  Approximately half an hour into the interview, the defendant terminated it, claiming that she could not answer detailed questions out of the blue about revenue contracts and asking to reconvene the interview at a later date.  Later that day, an attorney representing the defendant called to reschedule the interview for the following day.  The next day, shortly before the rescheduled interview, Pierce's attorney called to cancel the interview on account of the defendant's purported illness.  The interview was again rescheduled for the next day.  Before the interview was to begin, Pierce's attorney submitted a resignation letter from Pierce.  The defendant never sat for the follow-up interview.

Despite receiving $325,000 in investment funds from Victim-3, and $40,000 from Victim-4, Pierce never provided either of them with any shares in Quintillion, or any documentation manifesting the transfer of shares in Quintillion, or in any other company holding an ownership interest in Quintillion.  Instead, records for Pierce's Personal Bank Account showed that she had co-mingled Victim-3's and Victim-4's investment funds with her own money and used a substantial portion of their funds to cover her and her husband's personal expenses, in effect paying herself a salary with their money.  For example, Wells Fargo records will show that Victim-3's initial $100,000 investment was used, among other ways, to fund a "New/Retirement" account in Pierce's name with $30,500, pay Pierce's and her husband's credit card bills and mortgage, and cover a $10,000 check to Custom Homes and Business Solutions ("CHBS"), a business unrelated to Quintillion which Pierce and her husband jointly controlled. Of the next $100,000 from Victim-3,

---

[2] Quintillion subsequently waived privilege over this particular interview and disclosed it to law enforcement.

approximately $43,300 was "loaned" to Quintillion, $28,000 used to fund a check to Quintillion, with the memo "Capital In," suggesting that the check was used to acquire shares in Pierce's own name, and the rest was used to cover the Pierce household's and CHBS's expenses.  Of Victim-3's final $125,000 investment, approximately $50,000 was sent by check to an entity consisting of Quintillion's original minority investors, before Victim Firm-1's involvement.  The remainder was again overwhelmingly used for the Pierce household's and CHBS's expenses.

It was not until after the fraud against Victim Firm-1 and Victim Firm-2 was discovered, Pierce had resigned, and Victim-3 threatened to sue, that Pierce made a request to the board of directors of Quintillion to transfer certain shares in those Quintillion entities to Victim-3.  However, the Quintillion directors refused the request pending their internal investigation and the subsequent criminal referral to this Office.  Victim-3 ultimately filed a lawsuit against Pierce seeking an injunction requiring Pierce to transfer Jensen's ownership interests in the shares, an award of monetary damages, attorney's fees and costs, and other relief.  On or about January 15, 2019, Pierce signed a Confession of Judgment in the amount of $375,000 in favor of Victim-3.

The defendant has never made any effort to transfer any shares to Victim-4, or reimburse Victim-4 her and her partner's total investment of $40,000.

## DISCUSSION

### I.   Evidence of Pierce's Fraud Against Victim-3 And Victim-4 Are Admissible as Direct Evidence of the Charged Scheme or, in the Alternative, Pursuant to Rule 404(b)

The Government expects to call Victim-3 and Victim-4 as witnesses at trial. For the reasons discussed below, their testimonies and related documentary evidence are admissible as direct evidence of the fraudulent scheme charged in the Indictment.  In the alternative, such evidence is admissible to prove the defendant's identity, plan, intent and absence of mistake, pursuant to Rule

404(b) of the Federal Rules of Criminal Procedure, and should not be precluded under Rule 403 because its probative value is not substantially outweighed by the risk of unfair prejudice to the defendant.

### A.    Applicable Law

#### 1.   Prior Crimes or Other Acts Admissible as Direct Evidence

The Second Circuit has repeatedly held that actions and statements are admissible as direct evidence of the crimes charged, and are "not considered other crimes evidence under" Federal Rule of Evidence 404(b), if (a) they "arose out of the same transaction or series of transactions as the charged offense," (b) they are "inextricably intertwined with the evidence regarding the charged offense," or (c) they are "necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000); *see also United States v. Quinones*, 511 F.3d 289, 309 (2d Cir. 2007); *United States v. Baez*, 349 F.3d 90, 93–94 (2d Cir. 2003). Evidence of uncharged criminal activity is thus admissible when it constitutes intrinsic or direct proof of the charged crime.

In such circumstances, the uncharged crimes evidence is "appropriately treated as part of the very act charged, or, at least, proof of that act." *Quinones*, 511 F.3d at 309 (internal citations and quotations marks omitted). And direct evidence is "not confined to that which directly establishes an element of the crime." *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997). As the Second Circuit has explained, "[t]o be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." *Id.* at 941; *accord United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991); *United States v. Inserra*, 34 F.3d 83, 89–90 (2d Cir. 1994) (evidence of prior false statements properly admitted to provide the jury with the complete story of the crimes charged, including defendant's knowledge and intent, and to demonstrate the context of certain events

relevant to the charged offense).  Such evidence is not subject to a Rule 404(b) analysis because it is direct evidence of the charged crime.

### 2.  Other Acts Admissible Under Rule 404(b)

Evidence of "a crime" is admissible under Rules 404(b) and 403 if it (1) is advanced for a proper purpose; (2) is relevant to a material issue at trial; (3) has probative value that is not substantially outweighed by any unfair prejudicial effect; and (4) is admitted subject to a limiting instruction, if one is requested.  *See, e.g.*, *Huddleston v. United States*, 485 U.S. 681, 691–92 (1988); *United States v. Brand*, 467 F.3d 179, 196 (2d Cir. 2006).  Permissible purposes for introducing evidence of other acts include "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2); *see, e.g.*, *United States v. Newsom*, 438 F. App'x 16, 18–19 (2d Cir. 2011) (finding evidence of defendant's separate fraud, different from the offense conduct on trial, was properly admitted after the defense placed intent at issue).

The Second Circuit follows "an 'inclusionary' approach to other act evidence under Rule 404(b), which allows such evidence to be admitted for any purpose other than to demonstrate criminal propensity."  *United States v. LaFlam*, 369 F.3d 153, 156 (2d Cir. 2004).  The Court has broad latitude in determining whether to admit evidence pursuant to Rule 404(b), and its ruling will be reviewed only for abuse of discretion. *See, e.g.*, *United States v. Mercado*, 573 F.3d 138, 141 (2d Cir. 2009).

The admission of extrinsic evidence concerning a defendant's prior conduct is particularly appropriate where the defendant's state of mind is at issue:

> Federal Rule of Evidence 404(b) . . . generally prohibits the introduction of evidence of extrinsic acts that might adversely reflect on the actor's character, unless the evidence bears upon a relevant issue in the case such as motive, opportunity, or knowledge. Extrinsic

14

> acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct.

*Huddleston*, 485 U.S. at 685.  The Second Circuit repeatedly has held that "[w]here intent to commit the crime charged is clearly at issue, evidence of prior similar acts may be introduced to prove that intent." *United States v. Caputo*, 808 F.2d 963, 968 (2d Cir. 1987).  The defendant's knowledge and intent is in issue unless the defendant has unequivocally conceded that element of the offense.  *See, e.g.*, *United States v. McCallum*, 584 F.3d 471, 475–76 (2d Cir. 2009) ("Because [the defendant's] counsel did not make a statement to the court of sufficient clarity to indicate that intent and knowledge would not be disputed, those issues remained sufficiently in dispute for the similar acts evidence to be relevant and hence admissible."); *United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993) ("Where a defendant claims that his conduct has an innocent explanation, prior act evidence is generally admissible to prove that the defendant acted with the state of mind necessary to commit the offense charged.").  With respect to the timing of the Government's presentation of the proffered evidence, the Second Circuit has made clear that where it is apparent that knowledge or intent will be in dispute, "evidence of prior or similar acts may be introduced during the government's case-in-chief, 'rather than waiting until the conclusion of the defendant's case.'" *United States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992) (quoting *Caputo*, 808 F.2d at 968).

Evidence of prior fraudulent activity has been routinely found to be admissible under Rule 404(b) in fraud cases.  *See, e.g.*, *United States v. Birrell*, 447 F.2d 1168, 1172 (2d Cir. 1971) ("Evidence of similar acts in fraud cases may be introduced where knowledge or intent is at issue, to give rise to an inference of knowledge or intent, or where the actual making of the misrepresentations is at issue, to establish the existence of a larger continuing plan or design.").

15

Where evidence is offered for a proper purpose under Rule 404(b), the Court may only exclude the evidence under Rule 403 if the probative value of the evidence is "substantially outweighed" by the danger of unfair prejudice. *Zackson*, 12 F.3d at 1182. With regard to the prejudice prong, evidence is unfairly prejudicial "only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980). Moreover, Rule 403 does not bar evidence of other bad acts that "did not involve conduct any more sensational or disturbing than the crimes with which [the defendant] was charged." *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990). All relevant evidence is to some degree prejudicial; *unfair* prejudice means, however, an "undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403, advisory committee's note to 1972 proposed rules. Evidence that "did not involve conduct any more sensational or disturbing" than the charged crimes should generally be admitted. *Pitre*, 960 F.2d at 1120 (quoting *Roldan-Zapata*, 916 F.2d at 804). Thus, when opposing the admission of evidence under Rule 404(b), a "[d]efendant must show some undue prejudice, apart from the prejudice implicit in Rule 404(b) evidence." *United States v. Vargas*, 702 F. Supp. 70, 73 (S.D.N.Y. 1988).

### B. Discussion

#### 1. Evidence of the Frauds Against Victim-3 and Victim-4 is Admissible as Direct Proof of the Charged Scheme

Evidence that the defendant defrauded Victim-3 and Victim-4 is admissible as direct proof of the charged scheme to defraud the Victim Firms because those frauds are "inextricably intertwined with the evidence regarding the charged offense," are "necessary to complete the story of the crime on trial," *Carboni*, 204 F.3d at 44, and "add[] context and dimension" to proof of the charged scheme, *Gonzalez*, 110 F.3d at 941. Pierce's misrepresentations to each of the four victims

16

were part of her ongoing scheme to acquire investments by misrepresentations to pay her salary and expenses and build the Fiber Optic System.

The defendant's misrepresentations to Victim-3 occurred during the planning phase of the project. As discussed above, the defendant persuaded Victim-3 to make his first two investments in May and December 2013, during the period when the defendant and Company-1 were developing the concept of the international fiber optic network and getting ready to pitch it to Victim Firm-1. Victim-3's third investment occurred in August 2014, after Victim Firm-1 had committed seed money for the Fiber Optic Network, but before it had agreed to the overall construction of the Fiber Optic System. Subsequently, Pierce provided Victim-3 with analyses showing how on September 1, 2014, as a result of Victim Firm-1's investment, $200,000 of Victim-3's common shares of Quintillion had purportedly been converted to shares valued at $477,275.

Victim-4's $40,000 investment occurred in August 2015, within a couple of months after Victim Firm-1 committed approximately $120 million to the Subsea System and approximately two to three months after Pierce presented Victim Firm-1 with five Fake Revenue Contracts containing forged counter-party signatures.

Thus, Pierce's frauds against Victim-3 and Victim-4 were inextricably intertwined by timing and purpose with the fraud on Victim Firm-1, and formed part of her overall scheme to use fraudulent pretenses whenever expedient or necessary to raise money to fund the Fiber Optic Network, including her own compensation. As such, the frauds against Victim-3 and Victim-4 should be admitted as direct evidence of the charged crimes in the Government's case-in-chief.

      **2.  Evidence of the Frauds Against Victim-3 and Victim-4 Is Also Admissible Pursuant to Rule 404(b)**

In the alternative, evidence of the frauds against Victim-3 and Victim-4 is admissible pursuant to Rule 404(b) to prove the defendant's identity, knowledge, intent and absence of mistake. Although the defense has not informed the Government of its theory, a potential defense is for Pierce to argue that she was not the person who forged the counter-party signatures on the Fake Revenue Contracts and therefore lacked knowledge and intent to defraud the Victim Firms when she held out the Fake Revenue Contracts as legitimate.   Under those circumstances, other act evidence – especially evidence that is temporally intertwined with the charged offenses, that share a common purpose (*i.e.*, the misrepresentations to all the victims were intended to induce investment in Quintillion), and that demonstrated similar modus operandi (i.e., the use of fake contracts) – is properly admitted to prove identity, knowledge, intent and absence of mistake.  *See Newsom*, 438 F. App'x at 18–19 (finding evidence of a separate fraud was properly admitted to prove intent); *United States v. Smith*, 727 F.2d 214, 220–221 (2d Cir. 1984) (finding similar act evidence was properly admitted to prove intent where defendant claimed that he was a victim of other fraudsters and market forces); *United States v. Aguilar*, 59 F. App'x. 326, 328–29 (10th Cir. 2003) (finding, in a trial for aiding and abetting fraudulent marriages to evade immigration laws, evidence that defendant arranged prior fraudulent marriages was properly admitted to show common scheme or plan); *United States v. Sparkman*, 500 F.3d 678, 683–84 (8th Cir. 2007) ("When a defendant is charged with insurance fraud, prior instances of insurance fraud may be admitted under Rule 404(b) to show the defendant's intent to commit the charged fraud if the prior fraud is similar to and not too remote in time from the charged fraud."); *United States v. Rude*, 88 F.3d 1538, 1549–50 (9th Cir. 1996) (holding that, in a prosecution for wire fraud and other crimes stemming from an investment fraud scheme, proof of a defendant's prior, similar investment fraud schemes was properly admitted to establish intent).  Here, a reasonable jury could infer from the

18

timing, common purpose and similar modus operandi that Pierce was the person who forged counter-party signatures on the Fake Revenue Contracts and knowingly held them out to the Victim Firms as legitimate agreements with the intent to deceive, and not because of any mistake, lack of knowledge or other innocent reason.

The probative value of the proffered evidence is not substantially outweighed by the risk of unfair prejudice to the defendant.  The frauds against Victim-3 and Victim-4 are of a similar kind as the fraud against Victim Firm-1 and Victim Firm-2.  Moreover, in comparison to the Victim Firms' investments, which exceeded $250 million, the losses to Victim-3 of at least $325,000 and to Victim-4 of at least $40,000, although substantial to the victims, were not so sensational as to likely cause unfair prejudice to the defendant.

The proffered evidence will also not cause undue delay or waste the jury's time.  The Government anticipates that Victim-3's testimony would last approximately one hour and Victim-4's testimony regarding her investment would last approximately half an hour.  Additionally, the Government also anticipates calling an FBI agent to testify about the disposition of the Victim-3's and Victim-4's investments.  In total, the proffered evidence would take up approximately half a day.  In summary, because the other act evidence described above would be offered for a proper purpose, would be relevant to an issue at trial, would not substantially more prejudicial than probative, and would not cause undue delay, the Government respectfully seeks a pretrial ruling allowing evidence of Pierce's fraud against Victim-3 and Victim-4 to be introduced in the Government's case-in-chief.

II.     **The Court Should Preclude The Defense From Offering Evidence Relating to Quintillion's Operations and Financial Condition After Pierce's Resignation**

The Government moves to preclude the defense from offering evidence – either through cross-examination of prosecution witnesses or in the defense case, if there is one – relating to

Quintillion's business operations and financial condition after Pierce's resignation for lack of relevance.  The Government anticipates adducing evidence relating to Quintillion's and Victim Firm-1's internal investigation following discovery of the fraud, including information and documents obtained from the Customers and statements that Pierce made during an interview with Quintillion's and Victim Firm-1's lawyers.  However, the prosecution will not be introducing evidence of Quintillion's operations and financial condition after July 2017.  Accordingly, to the extent there is a defense case, Pierce's counsel should be precluded from offering evidence relating to Quintillion's operations and financial status after she resigned.

### A. Applicable Law

The wire fraud statute penalizes using a wire communication to execute "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."  18 U.S.C. § 1343.  The "essential elements" of wire fraud are "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of . . . wires to further the scheme."  *United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016) (quoting *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015)).  "The gravamen of the offense is the scheme to defraud."  *United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 657 (2d Cir. 2016) (quoting *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008)).

While proof of a scheme or artifice to defraud "itself demands a showing that the defendant possessed a fraudulent intent, . . . the Government need not prove that the victims of the fraud were *actually* injured, but only that defendants *contemplated* some actual harm or injury to their victims."  *Greenberg*, 835 F.3d at 305–06 (emphasis in original) (quotation marks omitted) (quoting *United States v. Novak*, 443 F.3d 150, 156 (2d Cir. 2006)); *accord United States v. Dinome*, 86 F.3d 277, 283 (2d Cir. 1996).  As the Supreme Court has explained, "[b]y prohibiting

the 'scheme to defraud,' rather than the completed fraud, the elements of reliance and damage[s] would clearly be inconsistent with the statutes Congress enacted." *Neder v. United States*, 527 U.S. 1, 25 (1999).  Accordingly, "actual loss is irrelevant for purposes of liability because actual loss is not an element of . . . wire fraud."  *United States v. Abakporo*, 12 Cr. 340 SAS, 2014 WL 2608857, at *2 (S.D.N.Y. June 9, 2014).

"Irrelevant evidence is not admissible."  Fed. R. Evid. 402.  Evidence is relevant only if "it has any tendency to make a fact more or less probable than it would be without the evidence" *and* "the fact is of consequence in determining the action."  Fed. R. Evid. 401.  Even relevant evidence may be excluded if its probative value is substantially outweighed by the risk that it may confuse the issues or mislead the jury.  Fed. R. Evid. 403.

### B.    Discussion

Count One of the Indictment charges Pierce with devising a scheme to defraud from at least in or about May 2015 up to and at least in or about July 2017, the month Pierce resigned from Quintillion.  The remaining aggravated identity counts similarly stem from Pierce's actions while at Quintillion.  Evidence regarding Quintillion's operations and financial status after Pierce resigned from the Company should be precluded because it is irrelevant to whether she committed the charged crimes and its non-existent probative value is likely to be substantially outweighed by the risk that it will confuse the issues and mislead the jury.  In particular, Quintillion hired a new chief executive officer (the "New CEO") after the defendant's abrupt resignation during an internal investigation into her conduct.  The New CEO and his staff oversaw the successful completion of the Fiber Optic System.  In addition, the New CEO and his staff have taken substantial steps to maintain customer confidence, address customer concerns following public disclosure of the defendant's arrest and indictment, and stabilize Quintillion's finances.  Those remedial actions are

wholly irrelevant to whether the defendant knowingly presented the Fake Revenue Contracts to the Victim Firms in order to induce them to invest hundreds of millions of dollars, and knowingly forged counter-parties' signatures on the Fake Revenue Contracts.  The only reasons for offering evidence of Quintillion's operations and financial status after the defendant resigned would be to confuse the jury and invite jury nullification by suggesting to the jury that she should not be convicted because Quintillion has been able to mitigate losses caused by her fraudulent scheme and replace at least a portion of the revenue it had anticipated from the Fake Revenue Contracts.  Such evidence, offered for an improper purpose, should be excluded.

Moreover, the disclosure of Quintillion's internal confidential business information is likely to exacerbate harm to Quintillion. Quintillion is not a publicly held company.  Disclosure of Quintillion's current operations is likely to place it at a competitive disadvantage vis-à-vis its competitors and potential customers.  For example, if Quintillion's earnings are substantially lower than the market anticipated, customers may demand lower broadband rates knowing that Quintillion is short on customers.  If, on the other hand, Quintillion's earnings are higher than the market anticipated, then its competitors may seek to undercut Quintillion by compressing their prices.  Such confidential business information, which poses very real harm to Quintillion, has no bearing whatsoever on whether Pierce committed wire fraud and aggravated identity theft.  Accordingly, evidence as to Quintillion's financial condition and operations after July 2017 should be precluded.

### III.    The Court Should Preclude Cross-Examination That Invades Upon The Attorney-Client Privilege

The Government moves *in limine* to preclude Pierce's counsel from any cross-examination that invades the attorney-client privilege.  The Government anticipates that the defense will not oppose this motion.

A.      **Applicable Law**

The Second Circuit has held that district courts "can bar cross-examination of communication protected by an attorney/client privilege," in a criminal case. *United States v. Dennis*, 843 F.2d 652, 656 (2d Cir. 1988). Likewise, "[i]t is clear that government witnesses have a right to assert the attorney-client privilege on cross-examination." *United States v. Coven*, 662 F.2d 162, 170 (2d Cir. 1981); *see also United States* v. *Lin*, 225 F.3d 647, 2000 U.S. App. LEXIS 23455, at *6–7 (2d Cir. Sept. 12, 2000) (summary order) ("The Confrontation Clause does not deprive the trial judge of all discretion to set limits on cross-examination. . . . It is within the court's discretion to limit cross-examination to the extent that it would violate the witness's attorney-client privilege."). To be sure, "if the witness by invoking the privilege precludes inquiry into the details of his direct testimony, there may be a substantial danger of prejudice because the defense is deprived of the right to test the truth of his direct testimony," providing grounds for striking the direct testimony in whole or in part. *United States v. Cardillo*, 316 F.2d 606, 611 (2d Cir. 1963). However, "[w]here the privilege has been invoked as to purely collateral matters, there is little danger of prejudice to the defendant and, therefore, the witness's testimony may be used against him." *Id.*; *see also Coven*, 662 F.2d at 171.

Federal Rule of Evidence 501 states that, unless otherwise provided, "[t]he common law—as interpreted by United States courts in the light of reason and experience—governs a claim of privilege." Fed. R. Evid. 501. "The attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011). "The Supreme Court has instructed that, where the attorney-client privilege applies, its protections must be reliably enforced in order to effectuate its goal of promoting compliance with

23

the law." *In re Grand Jury Investigation*, 399 F.3d 527, 535 (2d Cir. 2005) (citing *Swidler & Berlin v. United States*, 524 U.S. 399, 409 (1998)).

**B.      Discussion**

The Government intends to call a paralegal ("Witness-1") who was present for the defendant's interview by Quintillion's and Victim Firm-1's attorneys on July 25, 2017. Witness-1 was, and is, employed by the law firm (the "Law Firm") that serves as Quintillion's outside counsel. Because Witness-1 was the only paralegal in the Law Firm's Anchorage office during the relevant time period, she has performed work from time to time related to Quintillion at the direction of the Law Firm and was privy to certain communications protected by the attorney-client communications. At trial, Witness-1 is expected to testify only from her personal knowledge about what occurred during Pierce's interview and Quintillion's subsequent unsuccessful efforts to reschedule the interview. The Government does not intend to elicit any testimony from Witness-1 beyond these limited topics. Although Quintillion has made a limited privilege waiver over the July 25, 2017 interview conducted as part of its internal investigation, and disclosed the interview to the Government, it has not waived attorney-client or work product privileges broadly among itself and its counsel. Quintillion and Law Firm-1 have not authorized Witness-1 to testify about any matters protected by the attorney-client or work-product privileges.

Given the narrow topics of Witness-1's anticipated testimony, the defense should not be permitted to go beyond the scope of Witness-1's direct examination, and inquire into privileged communications involving the Law Firm. Those communications are protected by the attorney-client privilege insofar as representatives of Quintillion and Victim Firm-1 (after Victim Firm-1 became the majority shareholder of Quintillion) conveyed information for the purpose of obtaining legal advice from the Law Firm, the Law Firm provided legal advice, and both sides discussed that

advice. *See Mejia*, 655 F.3d at 132.  Those confidential communications are at best, collateral to the issues at hand, particularly where, as here, the defendant has not given notice that she intends to raise any advice of counsel defense.  They could not be relevant to the elements of the charged fraud and aggravated identity theft crimes, which revolve around the defendant's making of false representations to the victims and the unauthorized use of other people's names and signatures in an effort to induce investments.  They do not have bearing on the knowledge, intent, or actions of the defendant.  Moreover, even if those communications did have some limited probative value, the intrusion upon the privilege, and the harms such an intrusion entails in terms of the reliability of the privilege, *see In re Grand Jury Investigation*, 399 F.3d at 535, substantially outweighs that limited value.  *See United States v. Scali*, No. 16 Cr. 466 (NSR), 2018 WL 604852, at *2–3 (S.D.N.Y. Jan. 29, 2018) (precluding cross examination of a witness as to certain information which the Government argued was protected by various privileges, including the attorney-client privilege, because it was irrelevant to the specific charges at issue); *Coven*, 662 F.2d 162, at 170–71, (upholding the district court's preclusion of cross examination invading upon the attorney-client privilege, even where the questions related to the witness's "state of mind or motivation when signing the [cooperation] agreement and, therefore, to his bias" because the witness's "state of mind when signing the cooperation agreement was a collateral matter going only to [his] general credibility," such that the "assertion of the attorney-client privilege did not deprive appellants of their constitutional right to confrontation").

For the reasons stated above, the Court should preclude the defendant from cross-examining Witness-1 with respect to topics outside of the July 25, 2017 interview of the defendant and efforts to reschedule that interview, or with respect to any other information protected by the attorney-client or work-product privileges.

IV.   **The Court Should Preclude Cross-Examination Of Witnesses On Matters Beyond The Scope Of Their Direct Examinations**

The Government also moves *in limine* to preclude Pierce's counsel from cross-examining the Government's witnesses – in particular, Witness-1, FBI Special Agent Sean Bartnik and Special Agent Alexander Turczak – on matters beyond the scope of their direct examinations.   The Government anticipates that the defense will not object to this motion.

A.   **Applicable Law**

The Federal Rules of Evidence on this point are clear:  "Cross-examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility." Fed. R. Evid. 611(b); *see Baker v. Goldman Sachs & Co.*, 669 F.3d 105, 110 (2d Cir. 2012) ("Once any direct examination is concluded, cross-examination within the scope of the direct follows."). While a district court may allow inquiry into additional matters as if on direct examination, Fed R. Evid. 611(b), the court nonetheless has broad discretion to police the scope of cross-examination. *See United States v. Bari*, 750 F.2d 1169, 1178 (2d Cir. 1984); *see also United States v. Rosa*, 11 F.3d 315, 335 (2d Cir.1993) ("[T]he decision to restrict cross-examination will not be reversed absent an abuse of discretion."); *accord United States v. Whitten*, 610 F.3d 168, 182 (2d Cir. 2010).

B.   **Discussion**

In this case, the defense should be precluded from cross-examining Witness-1 and Special Agents Bartnik and Turczak about matters beyond the scope of their direct examination.   As discussed above, Witness-1 will testify solely about what transpired during an interview of the defendant on July 25, 2017, and Witness-1's law firm's unsuccessful attempts to reschedule that interview.   The Special Agents' testimony will be similarly cabined.   Special Agent Bartnik is expected to testify, with the aid of a summary chart, about Internet protocol ("IP") logs, produced by Google LLC ("Google") pursuant to a search warrant, which showed the IP addresses used to

access a Google Drive account associated with the domain name quintillionnetworks.com and the subscribers to those IP addresses. The evidence will show that the defendant used the Google Drive account to transmit some of the Fake Revenue Contracts to Victim Firm-1. Special Agent Turczak will testify, also with the aid of a summary chart, about bank records which show the disposition of the investment money that Victim-3 and Victim-4 entrusted to the defendant.

Second Circuit precedent supports the Government's position. For example, in *United States v. Koskerides*, 877 F.2d 1129, 1136 (2d Cir. 1989), the district court precluded defense counsel from cross-examining a former IRS case agent regarding a part of his investigation that led to net worth computations testified to by other IRS agents, noting that the agent would be made available if the defense chose to call him as a witness. The Second Circuit affirmed, finding that the defendant's "attempted cross-examination with respect to net worth computations was outside the scope of agent Kramer's direct testimony," and, therefore, properly foreclosed under Federal Rule of Evidence 611(a) and (b). *Id.*; *see also United States v. Martinez-Montilla*, 82 F. App'x 53, 56 (2d Cir. 2003) (summary order) (affirming restriction of cross-examination of government witness that went beyond the scope of direct examination and noting that the defendant was free to recall the witness on the defense case); *United States v. Costanzo*, 581 F.2d 28, 34 (2d Cir. 1978) (same); *United States v. Adeniyi*, No. 03 Cr. 86 (LTS), 2004 WL 1077963, at *3 (S.D.N.Y. May 12, 2004) (finding "the court acted well within the discretion afforded to it under Fed. R. Evid. 611 and the relevant case law when it prohibited defense counsel from inquiring on cross-examination into additional aspects of the investigation that were far afield from those covered during direct examination," given that "[t]he Government's direct examination of [the witness] was limited to two very specific aspects of the investigation"). Accordingly, the defense should be precluded from

cross-examining Witness-1 and the Agents (and prosecution witnesses generally) about matters beyond the scope of their direct examination.

## **CONCLUSION**

For the reasons set forth above, the Government respectfully submits that the motions *in limine* should be granted.

Dated: New York, New York
       January 25, 2019

                           Respectfully submitted,
                           GEOFFREY S. BERMAN
                           United States Attorney

       by: _____/S/_____
                           Sarah Lai / Vladislav Vainberg
                           Assistant United States Attorneys
                           (212) 637-1944 / 1029