

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 12, 2019

The Honorable Edgardo Ramos
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    *United States v. Elizabeth Ann Pierce*
              <u>S1 18 Cr. 388 (ER)</u>

Dear Judge Ramos:

      The sentencing proceeding in the above-referenced matter is scheduled for June 19, 2019, at 10:00 a.m. The Government respectfully submits for the Court's consideration: this letter, six Victim Impact Statements attached hereto as Exhibits A to F, a proposed Preliminary Order of Forfeiture/Money Judgment, and supporting documentation for two victims' claims for restitution, attached hereto as Exhibits G and H. A proposed Order of Restitution will be submitted promptly after sentencing. As described below, the applicable sentencing range pursuant to the U.S. Sentencing Guidelines ("Guidelines" or "U.S.S.G.") is 210 to 262 months' imprisonment. For the reasons discussed below, the Government requests that the Court impose a substantial sentence of imprisonment, slightly below the twelve-year term recommended by the Probation Office, along with forfeiture and restitution. The Government further moves for permission to file a redacted or anonymized version of the Government's sentencing submission.

## I. The Offense Conduct

### Overview

      Elizabeth Ann Pierce (the "defendant" or "Pierce"), the former Chief Executive Officer ("CEO") of Quintillion, forged multiple sales contracts that would supposedly generate upwards of a billion dollars in guaranteed revenue over 20 years to Quintillion. Pierce then used those forged contracts to trick two investment companies into providing more than $270 million in debt and equity financing to Quintillion to build a fiber optic cable network in Alaska. She did so knowing that the investment companies would not have provided the needed funding without those forged sales contracts. Moreover, had the investment companies been aware that Pierce would resort to forgery, they never would have done any business with her, even if some of the sales contracts she negotiated were legitimate.

      As set forth in detail in the Presentence Investigation Report ("Presentence Report" or "PSR"), Pierce was the founder and, until July 2017, the CEO of Quintillion, a telecommunications

company located in Alaska.[1]  Quintillion built, operates and markets a high-speed fiber optic cable system that serves various communities in Alaska (the "Quintillion System").  (PSR ¶ 9).  Between in or about May 2015 and in or about July 2017, Pierce perpetrated a brazen fraud scheme against Cooper Investment Partners ("CIP") and Natixis New York Branch ("Natixis"; together, the "Victim Firms").  Specifically, in order to induce the Victim Firms to provide the massive amount of financing needed to construct the Quintillion System, Pierce presented contracts (collectively, the "Fake Revenue Agreements") with four Alaska-based telecom services companies (collectively, the "Victim TelCos") that purportedly contained binding commitments by the Victim TelCos to purchase specific wholesale quantities of capacity – measured in gigabits per second ("Gbps") – from Quintillion at specified prices once the Quintillion System was built.  (PSR ¶ 12).  Based on conversations with CIP representatives, Pierce knew that without the revenue stream assured by those Fake Revenue Agreements, the Victim Firms would not buy into the project.

The defendant initially attempted to secure legitimate revenue agreements with the Victim TelCos.  When those efforts failed, or did not yield the guaranteed revenue she knew would be needed to induce the Victim Firms to invest in her company, Pierce turned to forgery.  Unbeknownst to the Victim TelCos, Pierce forged their executives' signatures on at least eight Fake Revenue Agreements and related purchase orders.  In some cases, Pierce did so even though some of the Victim TelCos had already rejected key terms that she included in the respective Fake Revenue Agreements.  In other cases, negotiations were still ongoing when Pierce forged the counterparty's signature, and subsequently collapsed.  Pierce presented the Fake Revenue Agreements to CIP as legitimate contracts that would produce a guaranteed stream of future earnings.  Relying on Pierce's representations and the Fake Revenue Agreements, the Victim Firms provided over $270 million in equity and debt financing to Quintillion.  (PSR ¶ 13).

Over the course of the scheme, Pierce attempted to cover up her fraud, by continuing to attempt to negotiate with the Victim TelCos in hopes of reaching agreements identical to the ones she fabricated.  Her efforts were mostly unsuccessful.  The defendant completely failed to secure any revenue contract with one of the Victim TelCos, and the agreements she reached with the other three Victim TelCos contained less favorable terms for Quintillion than the Fake Revenue Agreements, such as a smaller mandatory capacity purchase commitment, or no commitment at all.  Pierce kept these genuine, but inferior, contracts hidden from the Victim Firms.  (PSR ¶ 13).  When Quintillion and CIP ultimately discovered the fraud in mid-2017, they learned that the real agreements actually negotiated by Pierce would generate only a small percentage of the anticipated guaranteed revenue of the Fake Revenue Agreements she forged.

---

[1] There are various related Quintillion companies which were reorganized during the relevant period and which currently have parent companies.  One set of those companies owns and operates the land-based portion of the Fiber Optic System; the other set of Quintillion companies owns and operates the subsea portion of the Fiber Optic System. The corporate structure of Quintillion is not material to this motion.  Thus, for purposes of this motion, we refer to all of the Quintillion companies, individually and collectively, as "Quintillion."

### The Quintillion System

Beginning at least in or about 2014, Pierce and others conceived of a plan to build an international, high-speed fiber optic cable system that would run from Japan through Alaska to England.  The Alaska portion would consist of three segments (collectively, the "Quintillion System"): an underwater segment that would span the Alaskan Arctic (the "Subsea System"); a land-based segment that would run north to south along the Dalton Highway (the "Terrestrial System"); and a land-based network of pre-existing and new fibers (the "In-Field System") that would connect the Subsea System as well as the oil and gas fields in Prudhoe Bay to the Terrestrial System.  The Terrestrial System would connect to the lower 48 States via a network of existing fibers operated by other telecommunications carriers.  The plan was to sell broadband capacity from the Quintillion System exclusively to governmental entities and other carriers that, in turn, would resell that capacity to retail end users such as businesses, households and individuals.  (PSR ¶ 16).

Quintillion's revenue agreements are called capacity service agreements ("CSAs").  They contained certain standard provisions, including:  price per Gbps per month; originating and ending points of service; the customer's minimum capacity purchase commitment, if any; the customer's incremental capacity commitment, if any; acceptable and/or prohibited resale customers, if any; and reference to an order form.  Importantly, some of the CSAs were so-called "take-or-pay" contracts.  Under a "take-or-pay" CSA, a customer agreed to buy a predetermined amount of capacity regardless of its ability to use or resell that capacity.  Other CSAs contained no minimum capacity purchase commitment from the customer.  Rather, the customer's purchase obligation was triggered if, and only if, the customer chose to submit an order form to Quintillion, and the form was signed by both Quintillion and the customer, which effectively converted the CSA into a take-or-pay contract.  Take-or-pay contracts represented guaranteed future earnings; CSAs without either a take-or-pay clause or an order form did not.  The defendant was the only person who signed revenue agreements and order forms on behalf of Quintillion.  (PSR ¶ 17).

### The Fraudulent Scheme

Prior to 2015, Pierce had negotiated two genuine CSAs for the Quintillion System.  One of the two contracts[2] involved the sale of Subsea capacity to a certain telecommunications company ("TelCo-1").  That contract was expected to produce, at a minimum, over $30 million in guaranteed revenue per year for twenty years, but only if TelCo-1's parent company guaranteed TelCo-1's performance.  Pierce was unable to obtain that guarantee, and Quintillion and TelCo-1 ultimately agreed to terminate their contract.  To compensate for the lost earnings, Pierce informed CIP in early 2015 that she would pursue a "Plan B," which was to negotiate CSAs with TelCo-1's expected customers that would cumulatively yield comparable volume and value.  (PSR ¶ 18). CIP's representatives made clear to Pierce that CIP would not commit construction funds without replacement CSAs that would offset the loss of revenue from TelCo-1.  That meant Pierce had to

---

[2] The second contract required the construction of the international portions of the originally proposed fiber optic cable system, which has not been built.  The contract has not been performed and did not influence CIP's decision to invest.

secure new revenue agreements before June 2015 if construction was to begin that year, because the construction route in the arctic for the Subsea System was accessible only from around June to October.  (PSR ¶ 19).

Between May 14 and June 18, 2015, Pierce sent CIP three Fake Revenue Agreements (two for the Terrestrial System and one for the Subsea System) that contained take-or-pay clauses or were accompanied by executed order forms.  Those three contracts supposedly guaranteed Quintillion a minimum of $357,000,000 in revenue, and a maximum of over $1 billion if one of the customers purchased additional Subsea capacity, which Pierce assured CIP would occur.  (PSR ¶¶ 20-21).  Unbeknownst to CIP, the defendant had forged the counterparties' signatures on each of those Fake Revenue Agreements and associated order forms.  Relying on those fraudulent contracts, CIP executed a $122 million-dollar contract to build the Subsea System shortly after receiving the fake Subsea CSA.  In November 2015, CIP entered into another multi-million-dollar contract to build the Terrestrial System.  (PSR ¶ 22).

In early 2016, Quintillion and CIP began seeking supplemental debt financing from potential lenders.  Pierce knew from discussions with CIP that the amount of Quintillion's guaranteed revenue would affect the size of the loan.  So, in May and September 2016, Pierce forged counterparty signatures on two additional Fake Revenue Agreements which contained terms that the respective Victim TelCos had specifically rejected.  At around the same time, Pierce also secretly negotiated genuine CSAs with the same TelCos.  However, the genuine CSAs contained provisions that significantly disadvantaged Quintillion.  One genuine CSA did not contain a take-or-pay clause, unlike its forged counterpart.  The other genuine CSA gave away valuable resale rights.  Although Pierce knew that CIP would not have approved the genuine CSAs because of the unfavorable terms, she signed them anyways and concealed them from CIP, apparently hoping to buy time and use the early income stream from the genuine CSA to make it appear that the fake CSAs were in effect.  (PSR ¶ 23).  Compounding the fraud, the defendant also hid the fact that in order to induce one of the TelCos to enter into a genuine CSA, she executed a side agreement (unknown to CIP) to give much of that money back, by obligating Quintillion to buy from that TelCo 40 Gbps of unnecessary backhaul capacity (*i.e.*, connecting Alaska to the lower 48 States).  *See* CIP Victim Impact Statement, dated June 7, 2019, attached hereto as Exhibit A, at 3.  Each of the Fake Revenue Agreements was incorporated into project financing presentations to the eventual lender, Natixis, which approved a $50 million loan to Quintillion in December 2016. (PSR ¶ 25).

As detailed in CIP's letter, the actual earnings from the genuine CSAs that the defendant negotiated will be $480 million less than the sum that CIP had expected from the Fake Revenue Agreements.[3]  *See* Exh. A, at 3-4 (compare total Minimum Expected Full Term Revenue with total Actual Full Term Revenue in chart).

---

[3] As noted in the Presentence Report, the figures in the chart in paragraph 24 are based on only the CSAs as they existed in June 2015, when CIP executed the construction contract for the Subsea System.  (PSR ¶ 24).  CIP's calculations include other fraudulent agreements that post-date June 2015 as well as amendments to contract value as a result of Quintillion's mitigation efforts after the defendant resigned from Quintillion.  *See* CIP Ltr, at 4.

### Fraud Against Two Individual Victims

As part of Pierce's scheme to secure financing for Quintillion through fraud, she also swindled two individual investors: "Individual Victim-1" and "Individual Victim-2" (together, the "Individual Victims"). Pierce led them to believe that they would acquire ownership interests in Quintillion when, in fact, she used their money for her own personal benefit, which included funding a $30,500 retirement account for herself. (PSR ¶ 39).

In or about May 2013, while Quintillion was still in its planning phase, Pierce solicited an investment from Individual Victim-1, purportedly for Quintillion. To induce the investment, Pierce gave Individual Victim-1 a Quintillion operating agreement, a financing sheet, and other projections. Between May 2013 and August 2014, Individual Victim-1 gave Pierce three checks, totaling $325,000, which Pierce promised would be exchanged for shares in Quintillion. (PSR ¶ 41). With each payment from Individual Victim-1, the defendant agreed to execute all necessary paperwork to transfer shares to him. But instead of delivering on her promise, the defendant stalled by giving Individual Victim-1 false explanations and projections without ever transferring any shares to him, even though she herself did hold shares that she could have transferred. (PSR ¶ 42).

Individual Victim-2 was similarly deceived. In August 2015, Pierce offered Individual Victim-2 the opportunity to invest in a company named Alaska Fiber Holdings, LLC ("Alaska Fiber"), which the defendant falsely held out to be a Quintillion shareholder. In exchange for a $40,000 investment, the defendant promised Individual Victim-2 shares in Alaska Fiber. (PSR ¶ 43). In reality, Alaska Fiber did not exist. Rather than admit the scam, the defendant falsely blamed CIP for her failure to deliver any shares. (PSR ¶ 44).

Records for an account held in the defendant's and her husband's names (the "Pierce Bank Account") revealed that she used all of Individual Victim-2's investment and more than half of the Individual Victim-1's investment for her and her family's benefit. She "lent" the other half of Individual Victim-1's investment to Quintillion, and later repaid herself, but not Individual Victim-1, for those loans. (PSR ¶ 46).

### The Attempted Cover-Up and Destruction of Evidence

The Fake Revenue Agreements were take-or-pay contracts with the first payments due on the day that the respective Quintillion System became operational. Accordingly, in March 2017, in anticipation of the Terrestrial System being lit in April 2017, the Quintillion chief financial officer,[4] who was not aware of the fraudulent scheme, began preparing customer invoices based on the fake take-or-pay CSAs. Knowing that the Victim TelCos receiving the invoices would be shocked to receive them, Pierce told more lies and fabricated more fake documents to delay the exposure of her scheme. (PSR ¶ 27). For example, the defendant claimed that one of the customers, Victim TelCo-2, had stopped communicating with her and might be unable to meet its purported obligation to purchase 2 Gbps of capacity per month under its (forged) Terrestrial CSA.

---

[4] There is a typographical error in paragraph 27 of the PSR. Instead of "the Quintillion CEO … ," it should read "the Quintillion CFO …."

Pierce advised CIP not to threaten litigation so as not to jeopardize that Victim TelCo-2's ability to perform on its much larger Subsea CSA, which was also forged. Instead, the defendant assured CIP that she would secure other contracts of comparable value and concocted a fraudulent email to Victim TelCo-2 in which she pretended to cancel certain resale rights under its forged Terrestrial CSA. The defendant then "forwarded" that email to others at Quintillion in order to create the appearance of a contractual relationship with Victim TelCo-2 when, in fact, none existed. (PSR ¶ 28).

To replace the 2 Gbps of Terrestrial capacity that Victim TelCo-2 was supposedly going to buy, Pierce did negotiate two other agreements, each for 1 Gbps per month. One was legitimate; the other was not. The defendant told CIP that another telecom company, Victim TelCo-5, which had previously contracted to purchase 2 Gbps of Terrestrial capacity, had agreed to purchase one more Gbps. That was a lie and the contract that supposedly memorialized that agreement (styled as an Interim Indefeasible Right of Use ("IRU") Agreement) was forged. Around the same time, Pierce executed a substantially less favorable genuine Interim IRU Agreement with Victim TelCo-5 which she concealed from the Victim Firms. The genuine version did not offset one Gbps' worth of lost revenue from the fake Victim TelCo-2 Terrestrial CSA. Instead, the defendant structured the amount and timing of payments under the fake Victim TelCo-5 Interim IRU Agreement so that they seemed to cover a third Gbps of capacity from Victim TelCo-5. (PSR ¶ 29).

This pattern of cover-up continued with yet another contract. By April-May 2017, another Victim TelCo, Victim TelCo-3, had received an invoice based on a forged Terrestrial CSA that Victim TelCo-3 had not known existed. Pierce needed Victim TelCo-3 to pay or her scheme would be exposed. To that end, Pierce executed a genuine IRU Agreement with Victim TelCo-3 on completely different terms than the fake Victim TelCo-3 Terrestrial CSA, and did not disclose it to the Victim Firms. Again, she structured payments under the fake Victim TelCo-3 IRU Agreement to make them appear to derive from the forged Victim TelCo-3 Terrestrial CSA. (PSR ¶ 30).

The defendant's scheme began to unravel when yet another Victim TelCo, Victim TelCo-4, disputed invoices it received from Quintillion for capacity it had not ordered. When Quintillion and CIP initiated an internal investigation, Pierce initially feigned surprise and blamed Quintillion's outside counsel for the fake Victim TelCo-4 CSA. The defendant also deleted four documents containing forged counterparty signatures from a cloud-based account that she controlled. Ultimately, rather than submit to an interview as part of the internal investigation, Pierce resigned in July 2017 (PSR ¶¶ 32, 33, 35), months before the Subsea System became operational in December 2017.

## II. The Guilty Pleas

On February 11, 2019, Pierce pleaded guilty to all nine counts in the Superseding Indictment without a plea agreement. As such, Pierce stands to be sentenced for both the underlying wire fraud committed in Count 1, as well as the additional eight counts of aggravated identity theft in Counts 2 through 9, which each carry a mandatory two-year sentence. At least one of those mandatory two-year sentences must run consecutive to whatever sentence the Court imposes for the substantive fraud offense.

### III. Section 3553(a) Factors

For the reasons discussed below, the Government respectfully submits that a substantial sentence is warranted by the Section 3353(a) factors.  However, the Government is not seeking a Guidelines sentence because we believe it would be greater than necessary to accomplish the goals of sentencing in this case.

### A.  The nature and circumstances of the offense – 18 U.S.S.C. § 3553(a)(1)

The offense was indisputably serious and warrants a substantial sentence.  For years, Pierce lied to her investors and business partners, including people who had considered her a friend, in order to persuade them to invest over $270 million dollars in an infrastructure project of which she was the CEO.  To perpetrate her scheme, she concocted multiple fake contracts and purchase orders on which she forged counterparty signatures, fictitious revenue projections, and bogus emails with at least one telecom customer.  Rather than admit that the earlier CSAs from May and June 2015 were forged, she chose to compound her earlier lies by manufacturing yet more agreements and concealing their inferior genuine counterparts.  Indeed, Pierce even participated in efforts to force Victim TelCo-4 to arbitrate a revenue agreement that she knew to be fraudulent.

As a result of the defendant's scheme, Quintillion's actual earnings will be approximately $480 million less than the "guaranteed" revenue that CIP had expected from the Fake Revenue Agreements.  *See* Exh. A, at 3-4 (compare total Minimum Expected Full Term Revenue with total Actual Full Term Revenue).  "Beyond the pure fraud loss, [the defendant's] crimes caused CIP and Quintillion substantial collateral harm." *Id.* at 4.  Among other things, CIP had to hire outside counsel and forensic consultants to investigate the fraud; pay down the loan from Natixis; incur additional cost from having to use source capital; commit substantial time and resources to cooperate with the Government's investigation and prosecution; and engage in litigation and settlement efforts to try to renegotiate customer contracts and rebuild public trust after widespread publicity about Pierce's fraud as CEO.  *See id.*

The Victim TelCos have also been injured by Pierce's fraudulent scheme.  At a minimum, all of them have had to commit substantial time and money to conduct their own internal investigations when Quintillion initially sought to enforce the Fake Revenue Agreements.  For example, Victim TelCo-2 had to conduct a month-long investigation which entailed interviews with "legal counsel, former and current Victim TelCo-2 employees and current and former Victim TelCo-2 Board Members" and review of "voluminous electronic and physical files of relevant Victim TelCo-2 employees," all to prove that there was no genuine CSA between Quintillion and Victim TelCo-2.  *See* Victim TelCo-2 Victim Impact Statement dated May 28, 2019, attached hereto as Exhibit B, at 2.  Even after the internal investigation was concluded, the "upheaval lasted for months and caused substantial distress and distraction" until Victim TelCo-2 was assured that Quintillion would not pursue legal action to enforce the Fake Revenue Agreements.  *See id.*

The distress and upheaval also impacted the former Victim TelCo-2 executive (the "Victim Executive") whose signature Pierce had forged.  He "was put in the position of having to prove a negative," and felt that his "professional reputation" and entire career were being called into question.  *See* Victim Executive's Victim Impact Statement, dated May 1, 2019, attached hereto

as Exhibit C, at 2. He also initially worried that he had to spend a great deal of his own money to defend himself, until Victim TelCo-2 determined that he was a victim. *See id.*

Two of the Victim TelCos were also investors in the Quintillion System. Although not defrauded in the same way that the Victim Firms were, their investments were also negatively affected by the fraudulent scheme. As Victim TelCo-3 explains, Pierce had "represented to [Victim TelCo-3] that if it purchased initial capacity on the Quintillion network its future purchase obligations and costs would be reduced as additional subscribers entered into contracts with Quintillion." *See* Victim TelCo-3's Victim Impact Statement, dated May 2, 2019, attached hereto as Exhibit D, at 1-2. However, as a result of the fraudulent scheme and the ensuing negative publicity, Victim TelCo-3 has not realized those cost savings because other potential subscribers have been slow to purchase capacity from Quintillion. *See id.* Moreover, Pierce's fraud "cast a shadow" on Victim TelCo-3's reputation because it had invested in and assisted Quintillion with the Quintillion System, even though it had done so without knowing about the fraudulent scheme. *See id.* at 2.

Pierce also defrauded the Individual Victims, who knew the defendant professionally and thought they were investing in Quintillion. While in absolute terms, the pecuniary loss to these victims is overshadowed by the magnitude of CIP's investment, the impact was no less devastating to them. Pierce's fraud has caused Individual Victim-1 and his family "substantial financial loss, delayed retirement planning, and induced considerable mental strain," especially since they had considered Pierce a friend. *See* Individual Victim-1's Victim Impact Statement, attached hereto as Exhibit E, at 1. The $325,000 that Individual Victim-1 invested with Pierce represented roughly one-third of his retirement savings, which he cannot easily replace because he is retired. To date, Individual Victim-1 has received no money or shares in return for his investment from Pierce.[5]

The defendant also defrauded Individual Victim-2 of $40,000. To date, Individual Victim-2 has received none of her money back and no shares. Instead, months after Pierce resigned, she made a bizarre offer to name Individual Victim-2 a beneficiary in the defendant's will. *See* Individual Victim-2's Victim Impact Statement, attached hereto as Exhibit F, at 2. The Government believes that this was an attempt to prevent Individual Victim-2 from complaining to the authorities. Like Individual Victim-1, Individual Victim-2 has been emotionally devastated by the defendant's fraud. She "lost a lot of sleep worrying about the money [she] lost and how to make it up to [her] family." *Id.* Having been defrauded, she is now less trustful of others, embarrassed that she had worked for Pierce and Quintillion, and feels guilty that she had not seen warning signs. *Id.*

---

[5] According to the Presentence Report, Pierce's liabilities include a $375,000 debt to Individual Victim-1. That is the amount of a Judgment on Confession resulting from Individual Victim-1's civil lawsuit against Pierce. The Government notes that CIP and Individual Victim-1 have reached an agreement whereby CIP will voluntarily transfer a certain percentage of any shares it may receive as part of restitution in the instant case to Individual Victim-1. In consideration of that transfer, Individual Victim-1's attorney has informed the Government that his client would not seek to enforce the Judgment on Confession. To date, Individual Victim-1 has recovered none of his investment.

Pierce used more than half of Individual Victim-1's investment to pay her and her family's personal expenses during the two years before she was able to land CIP as an investor. For example, Pierce opened a retirement account in her own name with $30,500 on the same day that she deposited Individual Victim-1's first check for $100,000 into her personal bank account; wrote a check to her adult son for $500 with the memo "Just because"; and used thousands of dollars to pay the mortgage of her and her spouse's residence and fund her spouse's business. She used all of Individual Victim-2's investment to cover personal and familial expenses. The defendant informed the Probation Office that she did not earn a salary in her first two years of working at Quintillion. (PSR ¶ 98). While she may not have received, technically speaking, a "salary" during those two years, her bank account statements for the period from February 2013 to September 2014 reflect nearly $200,000 of "Direct Pay Deposits" from the two Quintillion entities.

In short, Pierce's actions reflected a determination to build a fiber optic network of which she would be the CEO, and to get paid for doing so, without regard for the costs to the Victim Firms, the Individual Victims, the telecom customers, or the credibility of Quintillion itself. And while Pierce did not abscond with the money provided by the Victim Firms – the primary reason why the Government supports a below-Guidelines sentence – she did receive over $730,000 in cash compensation and benefits as CEO, squander the bulk of the money from the Individual Victims for her own and her family's benefit and, stood to gain financially as a Quintillion shareholder. The nature and circumstances of her crimes warrant a substantial sentence.

## B. The history and characteristics of the defendant – 18 U.S.S.C. § 3553(a)(1)

The history and characteristics of the defendant also weigh in favor of a substantial incarceratory sentence. Pierce led a comfortable middle class life and was consistently gainfully employed before she committed the instant crimes. She has a college degree with a major in electrical engineering technology. (PSR ¶ 94). From 1991 to 2001, she worked for a radar company, earning $100,000 a year. From 2001 to 2012, she held various positions with a telecommunications company in Alaska, earning between $135,000 and $145,000 a year. (PSR ¶ 100). From 2012 to 2013, she earned between $10,000 and $25,000 per month as a freelance management consultant. (PSR ¶ 99). While Pierce's gainful employment prior to 2013 supports a downward variance from the Guidelines range of 210 to 262 months, which is driven primarily by the loss amount, it also underscores that her primary motivation in committing this crime was not some sort of financial desperation, but rather ruthless ambition and greed.

At the same time, her educational and family background also supports a substantial sentence. In light of her educational and family background and demonstrated earning potential, she had no financial excuse for engaging in criminal conduct. Moreover, her husband was gainfully employed by a labor union and is a business owner, and two of her stepchildren are also employed. (PSR ¶ 82). She committed fraud and aggravated identity theft because she placed her ambition above the law.

### C. The seriousness of the offense and the need for general and specific deterrence – 18 U.S.C. § 3553(a)(2)(A)-(C)

As discussed above, the offense was extremely serious.  There is a need for both general and specific deterrence.  A substantial sentence is necessary to deter other executives from investment fraud.

A substantial sentence is also necessary for specific deterrence because Pierce committed her crimes despite having had the benefit of consistently well-paid jobs.  The fact that she had no financial need to commit crime means that she was simply willing to defraud others in order to achieve her goals.  And although she has no prior criminal history, her criminal actions should not be minimized as an aberration or a mistake.  They began in at least May 2013, when she received the first check for $100,000 from Individual Victim-1 and continued for over four years, during which time she repeatedly lied to investors and forged other people's signatures.  They did not end until her scheme was exposed in July 2017.  Her duplicity was all the worse because she defrauded not only strangers, but people who knew and trusted her.  Given these circumstances, a substantial sentence is necessary to achieve the goal of specific deterrence.

### D. Medical care – 18 U.S.C. § 3553(a)(2)(D)

The Presentence Report noted that Pierce was diagnosed with a certain medical condition in 2017.  The Report also noted that she is currently stable with no follow-up treatment planned.  (PSR ¶ 88).  Accordingly, there is no medical reason why a substantial sentence should not be imposed.

## IV. The Defense's Arguments

The defendant disputes the Guidelines calculation in the Presentence Report on two grounds.  First, Pierce challenges the loss calculation under U.S.S.G. § 2B1.1(b)(1).  She claims that the actual and intended loss to CIP is zero, not more than $270 million, as the Government and the Probation Office found.  (Def. Mem. at 2-4).  Second, she contests the two-level enhancement for sophisticated means under U.S.S.G. § 2B1.1(b)(10).  (Def. Mem. at 4-5).  For the reasons discussed below, neither argument is availing.

### A. Loss Amount

#### 1. Applicable Legal Principles

The Sentencing Guidelines defines "actual loss" as the "reasonably foreseeable pecuniary harm that resulted from the offense," and "intended loss" as "the pecuniary harm that the defendant purposely sought to inflict[.]" U.S.S.G. § 2B1.1, comment. (n.3(A)(i) and (ii)).  "Pecuniary harm" means "harm that is monetary or that otherwise is readily measurable in money." *Id.,* comment. (n.3(A)(iii)).  "Reasonably foreseeable pecuniary harm" is "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *Id.*, comment. (n.3(A)(iv)).

The Application Notes to Guideline 2B1.1 identify non-exhaustive factors to consider in estimating loss. *Id.*, comment. (n.3(C)).   Those factors include the fair market value of property unlawfully taken, copied or destroyed; the cost of developing proprietary information, such as trade secrets; the cost of repairs to damaged property; in cases involving large numbers of victims, the average loss to each victim multiplied by the number of victims; the reduction in value that resulted from the offense in the value of equity securities or other corporate assets; and the scope and duration of the offense and revenues generated by similar operations. *Id.*

Once the loss is estimated, the Guidelines instruct sentencing courts to reduce the loss estimate by certain credits, including:

> (i)   The money returned, and the fair market value of the property returned and the services rendered, by the defendant . . . before the offense was detected.  The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim . . . ; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim . . . .

> (ii)   In a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing.

*Id.,* comment. (n.3(E)(i)-(ii)).

## 2.   The Presentence Report

The Probation Office calculated a total offense level of 37, as follows:  base offense level of 7, pursuant to U.S.S.G. § 2B1.1(a)(1); increased by 28 levels because the loss amount was more than $250 million but not more than $550 million, pursuant to § 2B1.1(b)(1)(O); increased by 2 more levels because the offense involved sophisticated means, pursuant to § 2B1.1(b)(10)(C); plus an additional 2 levels for abuse of trust, pursuant to § 3B1.3; and minus 2 levels for acceptance of responsibility, pursuant to § 3E1.1(a).  At Criminal History Category, the resulting Guidelines range is 210 to 262 months' imprisonment.

The Probation Office recommends an overall sentence of 144 months, which consists of four years on Count 1, to be followed by individually consecutive sentences of two years each on Counts 2 through 5 (i.e. an additional 8 years), as well as sentences of 24 months on counts 6 through 9 to run concurrent to the prior aggravated identity theft counts.

Pursuant to Application Note 2(b) of Section 5G1.2 of the Sentencing Guidelines, "[i]n determining whether multiple counts of 18 U.S.C. § 1028A should run concurrently with, or consecutively to, each other, the court should consider the following non-exhaustive list of factors:

(i)    The nature and seriousness of the underlying offenses. For example, the court should consider the appropriateness of imposing consecutive, or partially consecutive, terms of imprisonment for multiple counts of 18 U.S.C. § 1028A in a case in which an underlying offense for one of the 18 U.S.C. § 1028A offenses is a crime of violence or an offense enumerated in 18 U.S.C. § 2332b(g)(5)(B);

(ii)   Whether the underlying offenses are groupable under §3D1.2 (Groups of Closely Related Counts). Generally, multiple counts of 18 U.S.C. § 1028A should run concurrently with one another in cases in which the underlying offenses are groupable under §3D1.2; [and]

(iii)  Whether the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2) are better achieved by imposing a concurrent or a consecutive sentence for multiple counts of 18 U.S.C. § 1028A.

U.S.S.G. §5G1.2, comment. (n.2(B)).

The Government respectfully submits that because the aggravated identity thefts in this case arise from a single underlying fraud, they should run concurrent to each other.  However, in fashioning an overall sentence for the defendant, the Court should take into account the nature of those crimes, including the fact that Pierce stole the identity of at least five different individuals representing four different corporate entities, forged signatures on contracts committing those victims to pay upwards of hundreds of millions of dollars to Quintillion, made independent decisions to forge these contracts at eight different times over the course of about two years, from May 2015 to May 2017, and in addition defrauded two individuals of $365,000, mostly for her own personal benefit.

### 3. The Loss Amount for Purposes of Calculating the Applicable Guidelines Range Should Be CIP's Total Investment[6]

In keeping with the foregoing legal principles, the first step is to estimate the gross actual loss, that is, the reasonably foreseeable pecuniary harm to the CIP.  (The defendant does not dispute the loss to the Individual Victims.)   In this case, gross actual loss is CIP's total investment post-dating the first Fake Revenue Agreement in May 2015, through December 2017, when the entire Quintillion System was completed, plus the $27 million[7] that CIP repaid Natixis after discovering

---

[6] In this section regarding the loss amount, references to CIP's investment includes approximately $27 million of the Natixis loan that CIP repaid following discovery of the fraud.

[7] The total loan was $50 million.  Of that amount, $27 million had been drawn down by the time the fraud was discovered.  The unspent balance was returned to Natixis.

Pierce's fraud. That aggregate amount was approximately $270,577,670.00, representing the value of "property unlawfully taken" through fraud. U.S.S.G. § 2B1.1, comment. (n.3(C)(i)); *see United States v. Turk*, 626 F.3d 743, 750 (2d Cir. 2010) (holding that the loss was the total amount of a fraudulently induced loan because, "[w]ithout this deceit, [the defendant] could not have obtained her victims' money."). But for the Fake Revenue Agreements, CIP would never have invested. *See* Exh. A, at 4. The defendant does not appear to contest this method for estimating gross loss.

The second step is to determine if there are any applicable credits against loss. The Probation Office correctly did not apply any credits. The defendant, on the other hand, claims that credits against loss would reduce the net loss to CIP to zero, but has provided no specifics to support that assertion. Her remarkable contention is primarily based on Application Note 3(E)(ii) to Guideline 2B1.1, which deals with cases involving collateral. The crux of her argument is that the Quintillion System has been built, is now operating, and has earnings from some legitimate revenue contracts. Thus, the argument goes, the current value of Quintillion constitutes, or should be treated like, collateral and deducted from CIP's loss. (Def. Mem. at 3). This argument should be rejected.

The only meaningful security that CIP has is the expected revenue from the genuine CSAs. The value of those CSAs derives solely from the construction of the Quintillion System, which was financed entirely by CIP, not by the defendant. It would be absurd to reduce the victim's loss by the money that the victim itself had contributed. Moreover, it would be contrary to the Guidelines. Application Note 3(E)(ii) "applies only to an offense 'involving collateral pledged by the defendant.'" *See, e.g., United States v. Shuster*, F.App'x 208, 211 (2d Cir. 2010) (finding Application Note 3(E)(ii) inapplicable in the context of a Ponzi scheme because of the note); *cf. Turk*, 626 F.3d at 745 (defendants offered mortgages in buildings they owned as collateral for a loan to renovate those buildings). The CSAs did not belong to the defendant and, therefore, were not hers to pledge. Accordingly, there should be no credit against loss based on Application Note 3(E)(ii).

Approximately $161,800,000.00 of CIP's total investment was in the form of equity contributions. *United States v. Komar*, 529 F.App'x 28 (2d Cir. 2010), provides another reason why the CSAs should not be used to offset the equity component of the total loss. In *Komar*, the appellant had induced numerous people to invest in a partnership (the "Partnership") that owned a property in Brooklyn (the "Brooklyn Property") through misrepresentations and omissions. *Id.* at *29. At sentencing, the district court rejected Komar's argument that the loss to the individual investors should be reduced by the fair market value of the Brooklyn Property, which if sold could be used to repay the investors. *Id.* The Second Circuit affirmed, explaining:

> The application notes significantly omit any direction to apply the value of an equity stake as a credit against actual loss, even as they prescribe an offset in two related situations: (1) where money or property is returned to a victim before the offense is detected, *see* § 2B11, Application Note 3(E)(i); and (2) where collateral is pledged by the defendant to a victim, *see id.,* Application Note 3(E)(ii). These provisions, neither of which applies here, demonstrate that the Sentencing Commission knows how to provide for an offset against

> actual loss, but has chosen not to do so in the circumstances urged
> by Komar.

*Id.* at 29. *Komar* therefore teaches that CIP's gross loss should be measured by the amount it was fraudulently induced to invest and that loss should not be offset by its equity stake, *i.e.,* revenue from any legitimate CSAs.

Application Note 3(E)(i) offers the defendant no solace for a further reason. Under the plain language of Application Note 3(E)(i), there should be no credit against loss because the defendant returned no money or property to CIP *before* the defendant "knew or reasonably should have known that the offense was detected or about to be detected by" CIP. U.S.S.G. § 2B1.1, comment. (n.3(E)(i)). The defendant clearly knew by April 2017 at the latest, when the first invoices were sent to customers which had no payment obligations, that her gig was up. As of April 2017, she had returned no money or property to CIP, and no payments had been made on any legitimate CSAs. *See United States v. Bryson*, 101 F.Supp.3d 147, 156 (D. Conn. Apr. 1, 2015) (declining to offset loss by amount received by victims during the defendants' bankruptcy proceedings because Application Note 3(E)(i) only applies to "money returned to the victim *before* the offense was detected" (emphasis in original)).

If the Court were nonetheless to give credit against loss – which it should not do – then the Government submits that it should first determine the percentage drop in the value of CIP's investment, and then multiply CIP's gross loss by that percentage. This was the approach used in *Bryson*. In that case, there were two classes of victim-investors. One group invested after the onset of the charged wire fraud conspiracy and had been led to believe that they would acquire a *pari passu* position in certain funds, when in fact they were given only a junior position. *Id.* at 157-59. As to this group, the district court held that their loss equaled their entire investment, with no offset. *Id.* at 155-56. That holding supports the Probation Office's loss calculation in the instant case.

The second group of victims in *Bryson* invested before the start of the conspiracy, *i.e.,* they had not relied on the defendants' misrepresentations. However, other actions taken by the defendants during the conspiracy also reduced this latter group to junior investors. *Id.* at 157-58. The court determined that these victims' foreseeable loss was "the difference in value between the investments had they been *pari passu* and the junior investment." *Id.* at 158. The court found the difference in value to be 12 percent and concluded that the loss sustained by the second group of victims was 12 percent of their investment. *Id.* at 159. If the Court were to adopt the offset methodology in *Bryson*, then the drop in the value of CIP's investment would be the percentage difference between total Minimum Expected Full Term Revenue and the Actual Full Term Revenue, *see* Exh. A, at 4, or 69.2 percent ($694.80 million minus $213.95 million, divided by $694.80 million). 69.2 percent of $270,577,672 is $187,239,749. Adding the loss of $365,000 suffered by the Individual Victims, the total net loss would be $187,604,749. This net loss would reduce the total offense level by 2 levels.

The defendant also claims that there was no intended loss because, having invested in Quintillion herself, she could not have intended Quintillion to lose money. (Def. Mem. at 3-4). Her argument is unavailing. PIERCE unsuccessfully tried to negotiate legitimate revenue

contracts with the victims in this case before resorting to forgery. She knew that her victims were not willing to commit hundreds of millions of dollars in guaranteed take-or-pay contracts toward a Quintillion system that was not yet built. Armed with the knowledge that the market would not commit the revenue she was promising to CIP, PIERCE forged the contracts anyway, purposefully seeking to inflict pecuniary harm on CIP. *See* U.S.S.G. § 2B1.1, comment. (n.3(A)(ii)). PIERCE solicited financing from the Victim Firms knowing that the Fake Revenue Agreements that CIP had counted on were unenforceable and therefore worthless. That constitutes intended loss.

To summarize, the Government submits that CIP's total investment is the reasonably foreseeable actual pecuniary loss to CIP. CIP would not have assumed the risk of investing in Quintillion at all, but for the Fake Revenue Agreements. If the Court were to apply any credits against that loss amount in the manner described above, the net loss would be more than $150 million, but not more than $250 million, for a two-level decrease in the total offense level and a resulting Guidelines range of 168 to 210 months' imprisonment.[8]

## B. Sophisticated Means

### 1. Applicable Legal Principles

The Sentencing Guidelines provide that the base offense level should be increased by two levels when the offense of conviction involve sophisticated means, defined as "especially complex or especially intricate conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1(b)(10) and comment. (n.9(B)). "Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." *Id.*, comment. (n.9(B)). The Second Circuit has applied the sophisticated means enhancement in cases involving fraudulent documents, marketing materials with material misrepresentations, cover-up attempts, and careful planning. *See, e.g., United States v. Fofanah*, 765 F.3d 141, 146-47 (2d Cir. 2004) (recognizing that "the creation and use of false documents, and other tactics to conceal offense conduct, are indicia of the sophistication of an offense" and affirming the application of the enhancement to a defendant who used fraudulent titles, disabled car alarms, and coordinated with another person to ship stolen cars to Africa); *United States v. Stitsky*, 536 F.App'x 98, 112 (2d Cir. 2013) (affirming a sophisticated means enhancement because the defendants' scheme "(1) lasted several years; (2) reflected very careful planning; (3) included a careful effort to conceal the fraud by lying to business partners, lawyers and investors; (4) relied on creating and disseminating marketing publications that contained material misrepresentations; and (5) involved the creation of fictitious documents for the purpose of convincing investors to give money or not to redeem their money from their [investment].") (internal quotation marks omitted). The Court of Appeals further instructs sentencing courts to consider the totality of the circumstances in determining whether the sophisticated means enhancement is warranted. *See United States v. Jackson*, 346 F.3d 22, 25 (2d Cir. 2003) ("[E]ven if each step in the scheme was not elaborate, the total scheme [may be] sophisticated [when] all the steps [are] linked together.").

---

[8] Because in the Government's view, an appropriate and not greater than necessary sentence in this case would fall slightly below the twelve-year term recommended by the Probation Office, neither Guideline calculation impacts the Government's overall sentencing position.

### 2.   The Two-Level Sophisticated Means Enhancement Is Warranted In This Case

Applying the foregoing legal principles, the sophisticated means enhancement is plainly appropriate in this case.  The defendant fabricated a series of Fake Revenue Agreements and associated order forms; knowingly provided false financial projections based on those fake contracts for inclusion in numerous other documents, including presentations for project financing and the Quintillion Board of Directors; concocted fake emails to create the illusion of a legitimate customer relationship that did not in fact exist; negotiated and concealed from CIP two Interim Right of Use Agreements with payment schedules that were designed to cover up two of the Fake Revenue Agreements; and, instead of using Quintillion's existing computer network, established a separate iCloud Account that she controlled in an effort to hide the Fake Revenue Agreements from her own staff.  In addition, she executed a false agreement with Individual Victim-2 and gave false financial projections to Individual Victim-1 to deceive them into believing that they would obtain valuable interests in Quintillion.  Taken together, and considering that such conduct spanned four years, there can be no question that the sophisticated means enhancement is warranted in this case.

The defendant seeks to blame the victim and minimize the complexity of her scheme by alleging that CIP, "an experienced venture capital company," could have discovered the fraud by simply contacting the Victim TelCos.  To begin with, the defendant discouraged CIP from doing just that in conversations with its representatives, asserting that she maintain the relationship with Quintillion's own clients.  For example, Pierce told CIP representatives that Alaskans did not trust outsiders and therefore, customer relationships should be managed by her.  (PSR ¶ 31).  Second, CIP's due diligence involved requiring copies of actual signed contracts with Quintillion's customers rather than relying on Pierce's representations about those contracts.  CIP could not have detected that Pierce forged the contracts.    In any case, courts have looked to the defendant's, not the victim's, conduct to determine whether the sophisticated means enhancement is warranted. *See Fofanah*, 765 F.3d at 146-47; *Stitsky*, 536 F.App'x at 112.  For all of these reasons, the Probation Office was correct to apply the sophisticated means enhancement.

## V.  Forfeiture and Restitution

As a preliminary matter, the Government is troubled by the fact that the Presentence Report's list of assets showed that the defendant's current residence in Texas is under her spouse's name (the "Texas Home").  (PSR ¶ 24).  That appears to be an attempt to shield assets from forfeiture.  The Texas Home was purchased on or about May 4, 2018, shortly after a summons was served on the defendant on or about April 11, 2018.  *See* TitlePro 247 Property Details Report, attached hereto as Exhibit G.  On information and belief, the down payment and mortgage payments on the Texas Home derive from the sale of her former residence in Alaska (the "Alaska Home") on or about April 25, 2018, for approximately $415,000.  *See* property description, available   at   <https://www.zillow.com/homedetails/3541-Admiralty-Bay-Dr-Anchorage-AK-99515/36242_zpid/>.  The Alaska Home was jointly held in Pierce's and her spouse's names; and bank mortgage records showed that during the period from January 2014, to August 28, 2017, the mortgage was paid entirely from the Pierce Bank Account, which was also jointly held by Pierce and her husband.  Yet, the Texas Home is solely in Pierce's husband's name.  In reality, it is a joint asset.

Equally disturbing is the fact that she reported a balance of $49 in a Wells Fargo retirement account. (PSR ¶ 102). Based on bank records, the Government believes that this is the account that Pierce opened with $30,500 of Individual Victim-1's money. The *de minimis* balance means that Pierce has depleted that sum.

Further, records for the Pierce Bank Account showed multiple checks, each for several thousand dollars, drawn on an account jointly held by Pierce and her husband at a bank in Canada. That account does not appear on the list of assets in the Presentence Report. The Government respectfully submits that the defendant be questioned about that account at sentencing.

### A. Forfeiture

The Government submits the enclosed proposed Preliminary Order of Forfeiture/Money Judgment for the Court's consideration. The money judgment in the amount of $896,698.00 is based on the following:

(1) $733,448.00 in compensation (cash and health benefits) that the defendant received from Quintillion through July 2017, which she would not have received had Quintillion and CIP known of her fraud;

(2) plus $231,700.00 of Individual Victim-1's investment that the defendant used for her personal benefit;[9] plus

(3) plus $40,000.00 from Individual Victim-2 that the defendant used for personal benefit;

(4) minus $108,450.00 that the defendant invested in Quintillion in exchange for shares prior to CIP's involvement.

In addition, the Government seeks to forfeit the defendant's interest in the Texas Home and all of her shares in Quintillion, which she would not have received had Quintillion and CIP known of her fraud. The estimated value of the shares is $7,137,814.

### B. Restitution

The Government also requests the Court order restitution. Restitution would include the following:

(1) the loss to CIP, to be decided at sentencing;

---

[9] Forfeiture properly includes loss due to relevant conduct. *See, e.g., United States v. Venturella*, 585 F.3d 1013, 1017 (7th Cir. 2009) ("The plain language of the section 981(a)(1)(C) along with the expansive definition of "proceeds" indicates that the statute contemplates the forfeiture of property other than the amounts alleged in the count(s) of conviction."); *accord United States v. Lo*, 839 F.3d 777, 793 (9th Cir. 2016) ("The language of the forfeiture statute broadly makes forfeitable any property, obtained by the defendant directly or indirectly, as a result of the commission of a mail fraud or wire fraud offense.").

(2) $40,000 to Individual Victim-2;[10] and

(3) pursuant to 18 U.S.C. § 3663A(b)(4), the costs to Victim TelCo-2 and Victim TelCo-3[11] of assisting with the Government's investigation and prosecution, in the amounts of $80,295.20[12] and $51,018.41, respectively.  Supporting documentation is attached hereto as Exhibits H and I.

To ensure that funds are available for at least partial restitution, the Government requests that the Court direct the defendant to pay an initial installment of restitution in an amount to be determined by the Court, within 60 days of the entry of this Order, and to deposit the cash proceeds with the Clerk of the Court.  Based on the Presentence Report's list of assets, the defendant has assets which can be liquidated.  The Government will submit a proposed Order of Restitution after the sentencing proceeding.

## VI. Motion to Redact and Anonymize

Finally, the Government moves for permission to file redacted versions of the Government's sentencing submission and the exhibits.  The Government seeks to redact (1) the names of the Victim TelCos and Individual Victims in order to protect their privacy, and (2) all financial figures.

### A.  Applicable Law

The public has a firmly rooted right of access to judicial documents that is grounded both in common law and the First Amendment.  *Lugosch v. Pyramid Co.*, 435 F.3d 110, 119-120 (2d Cir. 2006) (internal quotation marks and citations omitted); *In the Matter of the Application of the New York Times Company to Unseal Wiretap & Search Warrant Materials*, 577 F.3d 401, 405 (2d Cir. 2009) ("[T]here is a qualified common law 'right to inspect and copy public records and documents, including judicial records and documents.'") (quoting *Nixon v. Warner Communications*, 435 U.S. 589, 597 (1978)).  "The presumption of access is based on the need for federal courts . . . to have a measure of accountability and for the public to have confidence in the administration of justice."  *Id.* (quoting *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995).  That presumption applies only to "judicial documents," which are items that are "relevant to the performance of the judicial function and useful in the judicial process."  *Id.* (quoting *Amodeo*, 71 F.3d at 1048).

The right of access is not absolute, however, and will yield when confronted with a compelling interest in favor of privacy.  *See Globe Newspaper Co. v. Superior Court for the County*

---

[10] The proposed Restitution Order includes restitution to Individual Victim-2, because she invested in August 2015, within the period charged in the Indictment.

[11] The other two Victim TelCos have decided not to submit a claim for restitution.

[12] Victim TelCo-2's original claim inadvertently included approximately $75,000 in costs associated with its internal investigation, prior to assisting the Government's investigation.  That amount has been deducted, resulting in a claim for $80,295.20.

*of Norfolk*, 457 U.S. 596, 606-07 (1982).  Thus, courts may close a criminal trial to the public and seal exhibits and transcripts if "specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest."  *Press-Enterprise Co. v. Superior Court of California*, 478 U.S. 1, 13-14 (1986) (quotation omitted).

### B. The Government Should Be Permitted To Redact/Anonymize Two Narrow Categories of Information

The Government seeks to (1) anonymize the names of the Victim TelCos and Individual Victims by replacing them with "Victim TelCo-[#]" and "Individual Victim-[#]," respectively, and (2) redact the amount that the Victim Firms invested in Quintillion and the expected and actual values of the CSAs, in the publicly filed version of this sentencing submission.  As discussed below, this narrowly tailored request is made to protect victim privacy and to avoid harm to CIP's competitive position.  The unmodified original is being provided to the defense.  The proposed modified version is enclosed for the Court's consideration.

With respect to the names of the Victim TelCos and the Individual Victims, the Government respectfully submits that disclosure of their actual identities is not necessary for the public "to have confidence in the administration of justice."  The parties do not dispute their identities, and the Government anticipates that the defense will not dispute anything in their Victim Impact Statements.  In the case of the Victim TelCos, the values of the CSAs bearing their names may be relevant to the loss calculation, but their names are not.  While their names would have to be included in an Order of Restitution, the Schedule of Victims is commonly filed under seal, consistent with 18 U.S.C. §§ 3771(a)(8) & 3664(d)(4).  Given the absence of any need to reveal victim names for sentencing purposes, the Government submits that the presumption of access is overcome by the strong interest in protecting victim privacy.

With respect to confidential business information, the Government seeks to redact the value of the Victim Firms' investment and the actual and expected values of the CSAs.  These figures are also not necessary for sentencing, except for the Restitution Order.  The parties dispute the methodology for calculating credits against loss, but the Government does not anticipate that the defense will contest the dollar figures to be used in the calculation.  Disclosure of those figures could adversely affect CIP's negotiations with customers, who may able to use knowledge of the gap between actual and expected values or surmise the price per Gbps offered to other customers to Quintillion's detriment.  It could also complicate Quintillion's future efforts to raise additional financing.

The Government's request is narrowly tailored and serves compelling interests of the victims.  We are not seeking to file the sentencing submission under seal, or to redact the names

of CIP and Natixis, which have already appeared in press reports.  Accordingly, the motion to redact and anonymize two narrow categories of information in this submission should be granted.

## CONCLUSION

For the reasons discussed above, the Government respectfully requests that (1) a substantial sentence below the Guidelines range of 210 to 262 months' imprisonment, and slightly below the 144-month range recommended by the Probation Office, be imposed, (2) the proposed Preliminary Order of Forfeiture/Money Judgment be issued, and (3) the motion to file a redacted version of the Government's sentencing submission be granted.  An Order of Restitution order will be promptly submitted after the sentencing proceeding.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney


by:     /s/ Sarah Lai
        Sarah Lai / Vladislav Vainberg
        Assistant United States Attorneys
        (212) 637-1944 / 1029